Case No. 24-5730

_____

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

REBECCA EDWARDS,

      Plaintiff – Appellee,

v.

SHELBY COUNTY, TENNESSEE,

      Defendant – Appellant.

_____

Appeal from the United States District Court
Western District of Tennessee, Western Division
Civil Case No. 2:22-cv-02682-SHL-tmp (Honorable Tu Pham)

_____

**SHELBY COUNTY'S APPELLATE BRIEF**

_____

R. H. "Chip" Chockley (TN BPR 20680)
E. Lee Whitwell (TN BPR 33622)
Julia Marie Hale (TN BPR 37204)
Shelby County Attorney's Office
160 N. Main, Suite 950
Memphis, TN 38103
(901) 222-2100

## <u>DISCLOSURE OF CORPORATION AFFILIATIONS<br>AND FINANCIAL INTERESTS</u>

Pursuant to Sixth Circuit Rule 26.1, Appellant make the following disclosures:

1.  Are said parties a subsidiary or affiliate of a publicly owned corporation?

    NO.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

    NO.

# <u>TABLE OF CONTENTS</u>

DISCLOSURE OF CORPORATION AFFILIATIONS AND FINANCIAL INTERESTS……………………………………………………………..…………ii

TABLE OF CONTENTS……………………………………………………..…iii

TABLE OF AUTHORITIES…………………………………………...……v

STATEMENT IN SUPPORT OF ORAL ARGUMENT…………………………ix

JURISDICTIONAL STATEMENT……………………………………..………1

STATEMENT OF ISSUES PRESENTED FOR REVIEW……………...………2

STATEMENT OF THE CASE……………………………………….…………3

SUMMARY OF THE ARGUMENT……………………………...……...……...15

STANDARD OF REVIEW…………………………………….…………………19

LAW AND ARGUMENT……………………………………..……...……...19

I.    Plaintiff's Alleged Night Blindness Is Not A Disability Under The ADA...19

A.    Night Blindness Which Only Limits The Ability To Drive Is Not A Disability…………………………………………………………..………21

      1.  Night Blindness Is Not A Disability…………………………………21
      2.  Driving Is Not A Major Life Activity…………………………..………22

B.    Even If Night Blindness Were A Disability And Even If Driving Were A Major Life Activity, An Employee Who Can Drive At Night Does Not Suffer From That Disability…………………………………………..………26

II.    Plaintiff Did Not Make A Good-Faith Request For An Accommodation For Night Blindness Because She Can Drive At Night……………….....…………28

III.    Plaintiff's Asthma Is Not A Disability Under The ADA……………..…31

CONCLUSION……………………………………………………...….…...34

DESIGNATION OF RECORD…………………………………...…….....…36

# <u>TABLE OF AUTHORITIES</u>

**CASES:**

**Sixth Circuit:**

*A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*,
  711 F.3d 687 (6th Cir. 2013)…………………………………………………..28

*Andrews v. Tri Star Sports & Ent. Grp., Inc.*,
  2024 WL 3888127 (6th Cir. Aug. 21, 2024) …….…..…18, 20-21, 30, 32-34

*Barnes v. Owens–Corning Fiberglas Corp.*,
  201 F.3d 815 (6th Cir. 2000)……………………………...…………………..19

*Brady v. Potter*,
  273 F. App'x 498 (6th Cir. 2008)……………………………………………27

*Fortney & Weygandt, Inc. v. American Mfrs. Mut. Ins. Co.*,
  595 F.3d 308 (6th Cir. 2010)……………………………………………..19

*Hurtt v. Int'l Servs., Inc.*,
  627 F. App'x 414 (6th Cir. 2015)………………………….…………..28

*McDowell v. Livonia Hotel Bus., Inc.*,
  2023 WL 4447039 (6th Cir. July 11, 2023). ……………………...………19

*Tchankpa v. Ascena Retail Grp., Inc.*,
  951 F.3d 805 (6th Cir. 2020)………………………………………………..20

*Thompson v. UGL Unicco*,
  472 F. App'x 396 (6th Cir. 2012)…………………………….…………27

*Wade v. General Motors Corporation*,
  165 F.3d 29 (6th Cir. 1998)…………………………………...…………22

*Winsley v. Cook Cty.*,
  563 F.3d 598 (7th Cir. 2009)…………………………………..…………23

**Other Circuits:**

*Capobianco v. City of New York*,
    422 F.3d 47 (2d Cir. 2005)……………………………………….…………24

*Chenoweth v. Hillsborough Cnty.*,
    250 F.3d 1328 (11th Cir. 2001)………………………………...………24

*Colwell v. Rite Aid Corp.*,
    602 F.3d 495 (3d Cir. 2010)…………………………………….………..25

*Hawkins v. Soc. Sec. Admin.*,
    368 F. App'x 136 (Fed. Cir. Mar. 5, 2010)………………….…………23

*Kellogg v. Energy Safety Servs. Inc.*,
    544 F.3d 1121 (10th Cir. 2008)…………………………………………..23

*Livingston v. Fred Meyer Stores, Inc.*,
    388 F.App'x 738 (9th Cir. 2010)………………………...…………24-25

*Shellenberger v. Summit Bancorp, Inc.*,
    318 F.3d 183 (3d Cir. 2003)……………………………….…………..30

*Sulima v. Tobyhanna Army Depot*,
    602 F.3d 177 (3d Cir. 2010)…………………………………….………..29

*Szwanek v. Jack in the Box, Inc.*,
    2021 WL 5104372 (9th Cir. Nov. 3, 2021)………………………………25

*Tabatchnik v. Cont'l Airlines*,
    262 F. App'x 674 (5th Cir. 2008)………………………...…………29

**District Courts:**

*Boker v. Sec'y, Dep't of Treasury*,
    2009 WL 3199074 (S.D. Ohio Sept. 29, 2009)..……………..…………32

*Edwards v. Shelby Cnty., Tennessee*,
    2024 WL 2964847 (W.D. Tenn. June 12, 2024)……………………14, 21, 24

*Garant v. Norfolk Southern Railway Co.*,
    453 F.Supp.3d 1027 (E.D. Mich. 2020)………………………………………20

*Hamby v. Ford Motor Co.*,
    2011 WL 6256964 (N.D. Ohio Dec. 14, 2011)………………...…………23

*Harris v. MatureCare of Standifer Place, LLC*,
    2015 WL 4662441 (E.D. Tenn. Aug. 5, 2015)………………...…….…25-26

*Limon v. Am. Red Cross*,
    2010 WL 11507857 (C.D. Cal. Oct. 6, 2010)……………………….………24

*Morey v. McDonald's Corp.*,
    2020 WL 2542161 (N.D. Ill. May 19, 2020)………………………...………23

*Mossinger v. State of Delaware Div. of Child Support Servs.*,
    2022 WL 17752261 (D. Del. Dec. 19, 2022)………………………...………24

*Sedarous v. Henry Ford Health Sys.*,
    2020 WL 4284064 (E.D. Mich. July 27, 2020)……………….……………23

*Sulima v. Def. Support Servs., LLC*,
    2008 WL 11492969 (M.D. Pa. Oct. 30, 2008)………………………………29

*Szwanek v. Jack in the Box, Inc.*,
    2020 WL 5816752 (N.D. Cal. Sept. 30, 2020)…………………...…………25

*Thompson v. UGL Unicco Serv. Co.*,
    750 F. Supp. 2d 907 (W.D. Tenn. 2010)……………………….……………27

## CONSTITUTIONAL PROVISIONS AND STATUTES:

28 U.S.C. § 1291……………………………………………..…………….…1

28 U.S.C. § 1331……………………………………………..…………….…1

42 U.S.C. § 1983……………………………………………………………...13

42 U.S.C. § 12101……………………………………………………………..1

42 U.S.C. § 12102…………………………………………………..…………....20

42 U.S.C. § 12112…………………………………………..…………………...19

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Defendant-Appellant Shelby County respectfully requests the opportunity to be heard in oral argument. This case involves unsettled issues within the Sixth Circuit and the facts and legal issues presented by this appeal can be further illuminated by oral argument and would aid the Court in its analysis.

Specifically, the District Court acknowledged that "the Sixth Circuit has not addressed whether night blindness qualifies as a disability" under the Americans with Disabilities Act. *Edwards v. Shelby Cnty., Tennessee*, No. 22-CV-02682-TMP, 2024 WL 2964847, at *18 (W.D. Tenn. June 12, 2024). And the Eastern District of Michigan has acknowledged that the Sixth Circuit "has not opined on the issue" of whether driving is "a major life activity" under the ADA. *Sedarous v. Henry Ford Health Sys.*, No. 2:19-CV-12525, 2020 WL 4284064, at *2 (E.D. Mich. July 27, 2020). Oral argument may aid in the analysis of these unsettled questions.

## **<u>JURISDICTIONAL STATEMENT</u>**

The Plaintiff brought the claims that were presented at trial under the Americans with Disabilities Act (as amended by the ADA Amendments Act of 2008), 42 U.S.C. § 12101, *et seq*. The District Court had federal question jurisdiction under 28 U.S.C. § 1331. The District Court's Summary Judgment Order and the Judgment dispose of all the parties' claims.

Appellant filed a timely Notice of Appeal with the District Court on August 9, 2024. (RE 85). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1. Whether night blindness is a disability under the Americans with Disabilities Act?

2. Whether night blindness that restricts only an employee's ability to drive at night under certain conditions is a disability under the Americans with Disabilities Act?

3. Whether an employee can suffer the disability of night blindness based on inability to drive at night when that employee can, has, and continues to drive at night?

4. Whether an employee's request for an accommodation for a shift change to accommodate her inability to drive due to night blindness is a good-faith request when the employee is actually capable of (and regularly does) drive at night?

5. Whether an employee's asthma amounts to a disability when the ailment giving rise to the need for an accommodation is a single incident in which the employee runs out of asthma medication?

## STATEMENT OF THE CASE

*1.    Introduction*

Plaintiff Rebecca Edwards drives at night. She claims that her employer, Shelby County, discriminated and retaliated against her based on her purported disability—night blindness—which she claims made her unable to drive home from work at night. However, she openly admits that she can, has, and continues to drive at night. She admitted at trial that she drives to the following places at night:

- Her mother's house, four miles away (Trial Transcript, Day 2, RE 98, PageID 1401, 1463);

- A Superlo grocery store (RE 98, PageID 1463-64);

- A Walgreens pharmacy (RE 98, PageID 1401);

- Three different Kroger grocery stores (RE 98, PageID 1401, 1463-64);

- and "***any kind*** of fast food" as long as she takes back streets (RE 98, PageID 1401) (emphasis added).

She also admitted that she had previously driven at night for her employer on the kinds of highways that she would later claim she could not drive on.

Plaintiff also has asthma. She claims that her employer, Shelby County, failed to accommodate her on a single date when, after running out of asthma medication, she had a sleepless night and was nonetheless required to report to work the next

day. She has only ever had a single asthma attack, and is able to control her asthma with medication.

2.    *Plaintiff's Employment*

Plaintiff Rebecca Edwards was hired by the Shelby County Health Department as a Covid-19 contact tracer in July of 2020. (Trial Transcript, Day 1, Testimony of Plaintiff, RE 97, PageID 1301). In December of 2020, she was promoted to an environmentalist inspector. (Trial Transcript, Day 3, Testimony of Laviette Crutchfield, RE 99, PageID 1610, 1612-13). This new position required driving at night, which she ably did without complaint.

Plaintiff admitted at trial that, as a part of her job duties in this new assignment, she drove at night on weekend assignments. These took place on Fridays and Saturdays "once or twice a month" from January to March of 2021. (RE 98, PageID 1375). She did not ask to be excused from driving at night at that time. Her explanation for why she was ok driving at night then was as follows:

> Yes, I had driven at night. But when I drove at night . . . we were escorted by the police, the sheriff, and then there was always a coworker with me. And it wasn't every night. So it was like a Friday and Saturday maybe once or twice a month. And then my way of getting through that is I would stay a car length between the car that was in front of me, and I would look down at their lights to pay attention.

*Id.* She gave no explanation for why she herself drove instead of the coworkers who were in the car with her. (RE 98, PageID 1376) ("And then I had coworkers with me. So, no, I was never alone.") And at no time during this January-March period

4

did she raise the issue of purported night blindness to her supervisors. (RE 98, PageID 1377).

After March of 2021, Plaintiff was reassigned when the Health Department ended its Covid-19 inspection protocol. (Re 97, PageID 1306). Later, in August of 2021, she was moved to the Care Coordination Team with three other team members: Nick Ayers, Velma Thomas, and Supervisor Susie Suttle. (RE 97, PageID 1307). The team's job involved transporting food, supplies, and patients, and providing care for indigent Covid-19 patients whom the Shelby County Health Department was housing at a local Econo Lodge hotel in Lakeland, Tennessee. *Id.*

Plaintiff made clear that she had serious concerns about security at the Econo Lodge worksite due to the perceived criminal element in the area. (*See, e.g.*, RE 97, PageID 1310) ("And me being a female, I just didn't want to be out there by myself . . . ."). This would be one of several issues of contention that arose between Plaintiff and her co-workers.

Prior to the issues regarding her health that are the subject of this case, Plaintiff testified that she got along well with her teammates and that there was no friction between them. (RE 97, PageID 1312; RE 98, PageID 1470). Every other member of her team disagreed with her on this point. Their emails from before she ever raised any ADA issues confirmed as much. (Trial Exhibit 22, September 8, 2021 Email from Nick Ayers) (". . . I feel that the picture painted by Ms. Edwards

was embellished and not an accurate portrayal . . . ."); (Trial Exhibit 23, September 8, 2021 Email from Sussie Suttle) ("Ms. Rebecca seems to have a motive for providing inaccurate information."); (Trial Exhibit 24, September 8, 2021 Email from Velma Thomas) (". . . I would appreciate if my colleague Rebecca Edwards were more cooperative and responsive with our team.").

*3.    Asthma*

Plaintiff was diagnosed with asthma in 2018. (RE 98, PageID 1357). She has only ever had one asthma attack, which took place in 2018 and led to her diagnosis. *Id.* She takes Breo, a "maintenance medication," and is prescribed Montelukast—a nighttime breathing aid. (RE 98, PageID 1355). She also carries an Albuterol inhaler, and is prescribed Flonase, a nasal spray that helps clear her nose. (RE 98, PageID 1355, 1466). She testified that there were things that she believed "***could*** happen" to cause an asthma attack, such as smelling perfumes or marijuana smoke. (RE 98, PageID 1467) (emphasis added). But she did not contest that these were hypotheticals. *Id; see generally* RE 98, PageID 1466 (Question: "Do you recall testifying during [your] deposition that if you had your asthma medication you were good, I think is what you said?" Answer: "I said, yeah, it's controlled to an extent . . . ."). In fact, she admitted to having been exposed to the smell of marijuana smoke in a previous job and not having an attack or seeking an accommodation. (RE 98, PageID 1469) (". . . I'd just tell the students to leave. And it was only an hour class.").

As is relevant to this case, Plaintiff contacted Supervisor Suttle on September 15, 2021 and said she could not come into work that day. (RE 98, PageID 1356). Her reason was that she had run out of her Breo medication the week prior, and was therefore up coughing and wheezing through the night, unable to sleep. *Id.* This was the first and only instance where Plaintiff ever asked for an accommodation based on her asthma. Plaintiff left Suttle a voicemail at around 4:30 a.m. to say she could not come in.

Suttle did not hear Plaintiff's message, and called Plaintiff at around 7:30 a.m. to discuss their worksite for the day. (RE 98, PageID 1359). It was at that time— approximately an hour before the shift was to start—that Suttle was actually informed that Plaintiff "couldn't come in, that [she'd] been coughing and [she hadn't] been able to sleep." (RE 98, PageID 1360) (". . . I told her it was because of my asthma and because I . . . didn't have my Breo, that was making it worse, and it was also worse because it was raining . . . ."); *see generally* RE 98 PageID 1368 (". . . I probably had just been asleep for like an hour.")).

In light of the short time frame, Suttle told Plaintiff it "was too late for her to get anybody to replace" her, and that Nick Ayers could not handle alone the eight-person family of patients the team had been assigned to transport and care for that day. (RE 98, PageID 1360). Thus, Suttle said Plaintiff still needed to come in. *Id.* Plaintiff went in and worked the full day. (RE 98, PageID 1368). She testified that

she continued to cough and wheeze, but she did not have an asthma attack or testify to having any specific difficulty performing the tasks assigned to her. *See id.* This one event was the only issue Plaintiff raised regarding asthma.

*4.    Night Blindness and the Shift Change*

Several weeks later, shift changes were implemented.[1] Plaintiff was told on October 4, 2021 that she would be working the 3:00-11:00 p.m. shift. (RE 98, PageID 1373). The idea was for the three team members—Plaintiff, Velma Thomas, and Nick Ayers—to have full coverage of the Econo Lodge throughout the day. (RE 98, PageID 1373). This shift assignment would require Plaintiff to be at the Econo Lodge alone after dark—a prospect she did not like. (RE 98, PageID 1374).

The next day, after speaking with Ms. Suttle, Plaintiff sent an email to Suttle and other supervisors protesting her new after-dark shift assignment. (Trial Exhibit 6, October 5, 2021 Email from Plaintiff). In that email, she made **no mention whatsoever** of night blindness, and instead complained exclusively about her concerns about crime after dark at the Econo Lodge.

> Ms. Suttle,
> Per our conversation on yesterday and this morning regarding a change in time and location of my shift. You stated, this shift was assigned to me based upon information you obtained from my co-workers. I really wish that you would have spoken directly to me instead of making your

---

[1] To be clear, Plaintiff brought distinct ADA claims for her asthma and her night blindness issues. As to asthma, the only claim she brought was a failure to accommodate claim based on Suttle's directive to come to work on September 15. Plaintiff did **not** allege discrimination or retaliation based on her asthma incident, or allege that the October shift changes were related in any way to the September asthma incident.

decision on hearsay. I will report to work at the Econo Lodge Lakeland (the location for my new shift) today and tomorrow under protest. I'm currently scheduled off for this Thursday and Friday.

I would like to inform you that this location is not safe **due to drug dealing, prostitution and other violent crimes.** There were drugs in Room 105, on Monday, September 13 at approximately 8:00 AM, they aimed high powered assault rifles at the Community Health Care driver when she arrived to pick-up clients. On another occasion, I was asked by a bounty hunter to knock on the door of Room 105 for him because he was scared that someone was going to shoot him if he knocked. I refused and quickly drove off the property. Equally so, there have been several late night shootings, carjackings and robberies along the 20 miles route that I will drive home. **Based on me being a female working alone** from 3:00 PM – 11:30 PM, I consider this hazardous to my well-being. **All other assignments of this nature, I was accompanied by a co-worker(s) and escorted by Memphis Police Officers and Shelby County Sheriffs.**

Under Occupational Safety and Health Administration (OSHA), I am requesting under the right to know standards section of OSHA the statistics of violent acts at the Econo Lodge Lakeland, 38002 zip code area as well as the driving route from Getwell to Goodlett to Sam Cooper to Interstate I-40. I look forward to receiving the requested information in accordance with OSHA guidelines.

*Id.* (emphasis added). She made absolutely no mention in her email of any concerns about night blindness, and instead focused solely on her fears about crime.[2]

---

[2] At trial, Shelby County challenged the accuracy of Plaintiff's claims regarding the extent of criminal activity, because one of the County's reasons for terminating her was its determination that she was actually exaggerating facts about crime to her supervisors. (*See, e.g.*, Testimony of Susie Suttle, RE 99, PageID 1568) ("It was dirty, but there was no criminal activities that I observed.") (Trial Exhibit 22, September 8, 2021 Nick Ayers Email) (". . . I feel that the picture painted by Ms. Edwards was embellished and not an accurate portrayal of the actual goings-on at the Econo lodge.").

The following day, Plaintiff reported for her shift, but did not stay the entire time. (RE 98, PageID 1398). When asked at trial why she left early, she stated "I just started getting scared. When I drove up that day . . . [t]here was a suspicious character I'd never seen before. And I just started thinking all kinds of thoughts like, okay, if he pulls me in, nobody will miss me. What am I going to do? So around somewhere between 8:00 and 8:30 I just got in the car and I drove home." (RE 98, PageID 1398).

Suttle called Plaintiff the very next day to tell her that Suttle and other management personnel had worked it out so Plaintiff did not have to work the evening shift again. (RE 98, PageID 1403). So, she never actually worked a full 3-11:00 p.m. shift.

In her conversations with Suttle where she protested working the late shift, Plaintiff at some point introduced the notion that she could not work that shift because of her difficulty driving at night. (RE 98, PageID 1374) ("I told her, I said, I can't work that shift. Number one, I can't see driving at night. I have nyctalopia. I have night blindness. I cannot work that shift. And then it's not safe out there, a woman by herself.") (RE 98, PageID 1374). Suttle responded by saying "you've driven at night before." (RE 98, PageID 1375). To that, Plaintiff responded "Yes, I had driven at night. But when I drove at night . . . we were escorted by the police, the sheriff, and then there was always a coworker with me. And it wasn't every night.

So it was like a Friday and Saturday maybe once or twice a month . . . ." (RE 98, PageID 1375).

Despite her statement to Suttle that she "can't see driving at night," Plaintiff's own testimony and other record evidence left no dispute that she actually can and does drive at night. When filling out her medical screening form for her job, she checked the "yes" box for asthma, but checked the "no" boxes for eye disease, eye injury, and color vision problems. (RE 98, PageID 1460).

Plaintiff testified extensively to the numerous places she drives at night. She said "I *try* not to drive at night." (RE 98, PageID 1463) (emphasis added). But she admitted that she drove to her mother's house, to three different Kroger grocery stores in the area, to a Superlo grocery store, to a Walgreens pharmacy, and to "*any* kind of fast food" restaurants as long as she took back streets. (RE 98, PageID 1401, 1463-64) (emphasis added). As Plaintiff put it, "[s]o if I had to, yes, I would go out, I would take the back streets, and I would come home. (RE 98, PageID 1401).[3]

Plaintiff did not provide evidence of any other aspect of day-to-day life— aside from driving—that was significantly hindered by her night blindness. She testified only that, if she walked into a brightly-lit room, it might "take a minute"

---

[3] She also implied that she drives at night going out to social engagements. (RE 98, PageID 1383) (Question: "Do you go out with friends or family who do not suffer from night blindness?" Answer: "Yes. So even when I am a passenger or *even if I'm driving, if that were to happen*, then it takes a moment for my eyes to adjust back when I go somewhere.") (emphasis added).

11

before her eyes could "adjust back" and she could do thinks like read a menu or mail, or watch TV. (RE 98, PageID 1383, 1402). And she admitted that, other than driving from the Econo Lodge to her house, her inability did not affect any other job duties. (RE 98, PageID 1465)(". . . I don't guess it would have.").

5.    *The Investigation and Termination*

On October 5, 2021, Suttle reached out to Health Department management to report various performance issues she had encountered throughout the last few months with the Plaintiff. (Trial Exhibit 12, October 5, 2021 Email from Suttle) ("I am not sure what Ms. Edwards wants to do but working is not it . . . She comes and goes as she likes and it does not matter what I say to her.").

An investigation was initiated. (Trial Exhibit 15, October 7, 2021 Email from Cassandra Brown). And feedback was requested of those with information about Plaintiff's attendance issues, as well as the accuracy of her claims regarding crime at the Econo Lodge. (Trial Exhibit 16, October 7, 2021 Email from Velma Thomas) ("I have never witnessed any criminal activities at the Econo [Lodge] in Lakeland, TN . . . When it comes to my colleague (Rebecca Edwards) regarding the delivery of morning meals, she usually showed up well after 9:00 am on several occasions and by then, the morning meals have already been delivered."); (Trial Ex. 20, October 7, 2021 Email from hotel manager Hinesh Patel); (Trial Ex. 19, October 7,

12

2021 Email from Jonathan Blasingame) ("I . . . did not witness any criminal activity during the times that I went to the Econo Lodge on 9/29/2021 and 10/06/2021.").

Management made the determination that Edwards had violated numerous Shelby County policies throughout September and October, 2021. (Trial Ex. 8, Disciplinary Action Form). These included habitual tardiness or absenteeism, and falsification of information. *Id.* The Plaintiff was terminated on October 11, 2021. *Id.*

### 6.  *Procedural History*

On April 9, 2022, Plaintiff filed a charge with the Tennessee Human Rights Commission, alleging discrimination based on disability, age, and religious creed, and also retaliation. On August 12, 2022, the charge was transferred to the U.S. Equal Employment Opportunity Commission. (RE 22, PageID 81). On January 18, 2023, the EEOC issued a Dismissal and Notice of Right to Sue.  *Id.* Plaintiff filed this lawsuit on October 7, 2022. (RE 1). In that suit, she brought claims under 42 U.S.C. § 1983 for alleged violations of her Due Process rights, and under the Americans with Disabilities Act (As Amended) for alleged failure to accommodate (regarding her asthma), discrimination (based on her night blindness), and retaliation (based on her requests for night blindness accommodations).[4] (RE 22).

---

[4] To be clear, Plaintiff did not bring a discrimination or retaliation claim based on her asthma, nor did she bring a failure to accommodate claim based on her night blindness. There was no overlap between the two alleged disabilities.

After the completion of discovery, Shelby County moved for summary judgment. (RE 38). The District Court granted the motion in part, dismissing Plaintiff's § 1983 Due Process claim. (RE 54).[5] However, the Court denied the County's motion with respect to Plaintiff's ADA claims, allowing them to proceed to the jury. *Id.* The County had argued at summary judgment that Plaintiff's ADA claims should not proceed because, among other things, Plaintiff did not actually suffer from any disabilities. (RE 38-2, PageID 177-184). In ruling that a triable issue of fact remained, the District Court acknowledged that "the Sixth Circuit has not addressed whether night blindness qualifies as a disability . . . ." *Edwards v. Shelby Cnty., Tennessee*, No. 22-CV-02682-TMP, 2024 WL 2964847, at *18 (W.D. Tenn. June 12, 2024).

The parties proceeded to a jury trial on July 16, 2024. (RE 71, 72, 73). Plaintiff called four witnesses: herself, Sussie Suttle, Laviette Crutchfield, and Jennifer Kmet. (RE 71, 72). At the conclusion of Plaintiff's proof, Shelby County orally moved for judgment as a matter of law under Rule 50. (RE 72; Trial Transcript, Day 3, RE 99, PageID 1671-1688). The County argued, among other things, that Plaintiff had not submitted evidence to overcome the legal realities that her asthma and her purported

---

[5] *Edwards v. Shelby Cnty., Tennessee*, No. 22-CV-02682-TMP, 2024 WL 2964847 (W.D. Tenn. June 12, 2024)

night blindness did not amount to disabilities under the ADA. *Id.* The District Court denied the motions. *Id.*

In its own case in chief, Shelby County called Velma Thomas, and then rested its case. (Re 72). The County renewed its Rule 50 motion, which was again denied. (RE 72). The jury returned a verdict in favor of Plaintiff Edwards, awarding her a monetary judgment of $205.46 for nominal damages and $410.92 in compensatory damages for her asthma failure-to-accommodate claim, and as to her night blindness claims $100,410.92 in compensatory damages and $38,009.73 in back pay.[6] (RE 78). The County again renewed its Rule 50 motion, which was again denied. (RE 73). The Court entered judgment on July 18, 2024, (RE 78), to which Shelby County timely appealed, (RE 85).

## SUMMARY OF THE ARGUMENT

As a matter of law, Plaintiff Rebecca Edwards is not disabled. Neither her asthma nor her night blindness amount to disabilities under the Americans with Disabilities Act. The District Court erred in allowing ADA claims stemming from these two purported disabilities to proceed to the jury, or to continue in trial in light of the proof presented on these issues.

---

[6] Plaintiff's counsel intend to seek attorney's fees as well, but that request is stayed pending the outcome of this appeal. (RE 95).

*1.    Disability Discrimination Based on Night Blindness*

Night blindness is not a disability under the Americans with Disabilities Act. The Sixth Circuit has not addressed this issue in a binding case, but other courts have found that it is not a disability. And, even if night blindness can in certain circumstances amount to a disability, the majority of courts have found that the inability to drive is not an ADA-covered major life activity. Thus, a person is not disabled if the only thing night blindness prevents them from doing is driving.

Further, and most problematically, Plaintiff Edwards ***can and does drive at night***. She admitted at trial to the numerous and regular occasions when she drives at night to her mother's house, grocery stores, convenience stores, outings with friends, and fast food restaurants. She also admitted to driving at night while working for Shelby County, giving only the dubious explanation that this was more feasible then because she had a police escort and passengers in the car. Even if the Court finds that night blindness can be a disability, and even if the Court finds that driving is a major life activity, the District Court erred in allowing Plaintiff's claim to proceed to the jury where the only evidence in the record is that she actually can and does drive at night.

*2.    Retaliation Based on Night Blindness*

Plaintiff's request for an accommodation based on night blindness was not made in good faith, and was therefore not protected under the ADA. Even if night

16

blindness is not a disability, an employee still receives protections under the ADA for protected conduct, including requests for accommodations. However, those requests must be made in good faith. Plaintiff's was not.

Courts have found that an employee's request for an accommodation is not made in good faith when the employee knows she is not actually disabled and is instead using a false claim of disability to seek an accommodation for some other, non-ADA protected reason.

In this case, Plaintiff had one clear reason for not wanting to work the late shift to which she was assigned: crime. She made her concerns known over and over again to management that she was disturbed about crime at the worksite, ***not*** about driving in the dark as she had done on the job multiple times in the past. When that complaint did not result in an immediate shift change, she told Supervisor Suttle something that she knew was not true—that she "can't see driving at night." She would go on in that conversation (and at trial) to admit over and over again that she can, has, and continues to drive at night. This is not a case about an employee who could not drive at night; this is a case about an employee who did not want to work a late shift. Plaintiff's retaliation claim should not have been presented to the jury.

3.    *Failure to Accommodate Based on Asthma*

Plaintiff's asthma is not a disability under the ADA in light of the mild and infrequent symptoms to which she testified. Unlike night blindness, asthma can in

some situations amount to a disability under the ADA. But asthma can form the basis of an ADA claim only if the condition rises to the level of a substantial limitation on a major-life-activity. Asthma is typically only a substantial limitation on the major-life-activity of breathing where the plaintiff has a long history of asthmatic attacks and endures numerous and severe restrictions on daily activities as a result of the condition. Where a plaintiff suffers asthma attacks only in response to particular stimuli and is able to engage in almost all normal life activities, no disability exists.

Here, the entire event giving rise to Plaintiff's asthma failure-to-accommodate claim was a single day, and only occurred because she ran out of Breo medication. It caused her to have a sleepless night of coughing and wheezing prior to having to come into work. While the County does not seek to minimize the discomfort she undoubtedly felt, Plaintiff was not disabled under the ADA. She had only ever had one asthma attack in 2018 when she was first diagnosed with asthma. And although she hypothesized at trial about potential scenarios she imagined ***could*** cause an attack, such as smelling marijuana smoke or certain perfumes, she conceded that none of these had ever actually happened. In light of this Court's recent ruling on an almost identical fact-pattern in *Andrews v. Tri Star Sports & Ent. Grp., Inc.*, No. 23-5700, 2024 WL 3888127 (6th Cir. Aug. 21, 2024), Plaintiff's asthma symptoms here simply do not amount to a substantial limitation on her breathing. This claim should not have proceeded to a jury.

18

Shelby County does not argue on appeal every argument that it made to the District Court or to the jury. Instead, the County asks this Court to review a few discrete issues, two of which are undecided in this Circuit. The County submits that those legal issues were wrongly decided at summary judgment and in response to the County's Rule 50 motions, and request that the judgment be reversed.

## STANDARD OF REVIEW

The Court reviews a district court's ruling on "Rule 50 motions for judgment as a matter of law *de novo.*" *McDowell v. Livonia Hotel Bus., Inc.*, No. 22-1740, 2023 WL 4447039, at *2 (6th Cir. July 11, 2023). Similarly, the Court reviews a district court's denial of summary judgment *de novo. See Fortney & Weygandt, Inc. v. American Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 310 (6th Cir. 2010). The Court will uphold a jury verdict unless it is contrary to the "clear weight of the evidence." *Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 820–21 (6th Cir. 2000).

## LAW AND ARGUMENT

## I.    Plaintiff's Alleged Night Blindness Is Not A Disability Under The ADA.

The purpose of the ADA and the subsequent ADAAA is to prevent discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, or privileges of employment." 42 U.S.C. § 12112 (a). "The ADA defines 'disability' based not on a

condition someone might have, but on what an individual can or cannot do." *Garant v. Norfolk Southern Railway Co*., 453 F.Supp.3d 1027, 1036 (E.D. Mich. 2020). A "claim of discrimination under the ADA requires a plaintiff to first establish that she has a disability that falls under one of the ADA's three definitions." *Andrews v. Tri Star Sports & Ent. Grp., Inc.*, No. 23-5700, 2024 WL 3888127, at *2 (6th Cir. Aug. 21, 2024)(citing *Tchankpa v. Ascena Retail Grp., Inc*., 951 F.3d 805, 811 (6th Cir. 2020); 42 U.S.C. § 12102(1)).

Under the ADA, a plaintiff is disabled if she "(A) [has] a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) [has] a record of such an impairment; or (C) [is] being regarded as having such an impairment." 42 U.S.C. § 12102 (1). In this case, Plaintiff only brought claims alleging that she was, in fact, disabled, and suffered ADA violations as a result. Thus, in order to prevail, she needed to show that she was substantially limited in a major life activity.

Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102 (2)(A). "A major life activity is 'substantially limited' when an individual cannot perform that activity as an average person in the general population could perform it, or if she faces significant

restrictions in the condition, manner, or duration under which she can perform the activity." *Andrews v. Tri Star Sports & Ent. Grp., Inc*., No. 23-5700, 2024 WL 3888127, at *4 (6th Cir. Aug. 21, 2024) (citation omitted).

## A.   Night Blindness Which Only Limits The Ability To Drive Is Not A Disability.

The District Court erred in allowing Plaintiff's night blindness claim to proceed to a jury. The Sixth Circuit has not yet ruled in a binding opinion on whether night blindness is a disability under the ADA. However, based on persuasive rulings from within this Circuit and prior, unpublished authority from this Court, the Court should find that it categorically is not a disability. Or, in the alternative, the Court should find that night blindness is categorically not a disability when the only activity it impacts is driving, which is not a major life activity under the ADA. And finally, even if the Court finds that such night blindness is a disability, the Court should find that a plaintiff cannot make out a disability claim for inability-to-drive night blindness when that plaintiff in fact can and does drive at night.

### 1.   Night Blindness Is Not A Disability.

The District Court erred in finding that night blindness is a disability, and therefore erred in allowing this claim to proceed to the jury. The District Court acknowledged that "the Sixth Circuit has not addressed whether night blindness qualifies as a disability . . . ." *Edwards v. Shelby Cnty., Tennessee*, No. 22-CV-02682-TMP, 2024 WL 2964847, at *18 (W.D. Tenn. June 12, 2024). However, in a

pre-amendment table opinion, this Court did address the issue in *Wade v. General Motors Corporation*, 165 F.3d 29 (6th Cir. 1998). While that opinion may not be binding, its logic is instructive on this issue. The plaintiff in *Wade* suffered from vision issues which prevented him from "driving during non-daylight hours." *Id.* at *1. He had been working a shift which ended after dark but, on advice from his doctor, requested shifts that started and ended during daylight hours so he could drive to and from his shift in the daylight. *Id.* The employer initially accommodated him, but later modified his shift again so that he did have to drive at night and he ultimately claimed disability discrimination. *Id.* The trial court granted summary judgment on various grounds, and the Sixth Circuit affirmed. In affirming the trial court, this Court noted that night blindness could not form the basis for disability discrimination. It explained "[t]he inability to drive in darkness is a common phenomenon that, if classified as disabling, would make most of the American population over the age of 45 'disabled' under the Act. We conclude that Congress could not have intended such a result." *Id.* at *2. Although not binding, the logic of the *Wade* opinion is sound and should govern the Court's finding here. Night blindness is not a disability under the ADA.

### 2.    Driving Is Not A Major Life Activity.

Even if night blindness could in some cases amount to a disability, it does not do so when the only activity it affects is the ability to drive because driving is not a

major life activity under the ADA. The Eastern District of Michigan held as much in a case just like the case here. *See Sedarous v. Henry Ford Health Sys.*, No. 2:19-CV-12525, 2020 WL 4284064 (E.D. Mich. July 27, 2020). The plaintiff in *Sedarous* requested an accommodation after an injury, which he claimed prevented him from driving. *Id.* at *1. When the request was denied he sued, alleging denial of his ADA rights. The District Court dismissed his claims, in part, finding that he could not show an ADA disability based on inability to drive alone: "Plaintiff provides no support for his contention that driving is a major life activity as contemplated by the ADA. Indeed, while the Sixth Circuit has not opined on the issue, other Circuits considering the issue have uniformly concluded that driving is not a major life activity." *Id.* at *2 (citing *Hawkins v. Soc. Sec. Admin.*, 368 F. App'x 136, 140 (Fed. Cir. Mar. 5, 2010); *Winsley v. Cook Cty.*, 563 F.3d 598, 603 (7th Cir. 2009); *Kellogg v. Energy Safety Servs. Inc.*, 544 F.3d 1121, 1126 (10th Cir. 2008); *Morey v. McDonald's Corp.*, No. 18 C 1137, 2020 WL 2542161, at *3 (N.D. Ill. May 19, 2020) ("[T]he [2008] ADAAA [ ] amended the list of activities expressly identified as major life activities and elected not to include driving among them, despite the fact that multiple Courts of Appeals had already held that driving was not a major life activity . . . .")).

Other district courts inside and outside the Sixth Circuit agree. *See, e.g.*, *Hamby v. Ford Motor Co.*, No. 1:11 CV 542, 2011 WL 6256964, at *5 (N.D. Ohio

23

Dec. 14, 2011) ("Additionally, courts have not found driving a car to be a major life activity."); *Mossinger v. State of Delaware Div. of Child Support Servs.*, No. CV 20-1526-GBW, 2022 WL 17752261, at *2 (D. Del. Dec. 19, 2022); *Limon v. Am. Red Cross*, No. CV0907355SJOFMOX, 2010 WL 11507857, at *11 (C.D. Cal. Oct. 6, 2010) (collecting cases).  As the Eleventh Circuit reasoned in reaching the same conclusion, it "would at the least be an oddity that a major life activity should require a license from the state, revocable for a variety of reasons including failure to insure. We are an automobile society and an automobile economy, so that it is not entirely farfetched to promote driving to a major life activity; but millions of Americans do not drive, millions are passengers to work, and deprivation of being self-driven to work cannot be sensibly compared to inability to see or to learn." *Chenoweth v. Hillsborough Cnty.*, 250 F.3d 1328, 1329–30 (11th Cir. 2001)

The District Court here cited four cases –*Capobianco*, *Livingston*, *Colwell*, and *Harris*—where a plaintiff was found to suffer a disability based on night blindness. *Edwards*, 2024 WL 2964847, at *18. But in two of those cases, the employee provided evidence that their night blindness affected more than just driving. *See Capobianco v. City of New York*, 422 F.3d 47, 54 (2d Cir. 2005) (employee could not even walk at night)[7];  *Livingston v. Fred Meyer Stores, Inc.*, 388 F. App'x 738, 740 (9th Cir. 2010) (employee could not drive, walk, or leave her

---

[7] Plaintiff testified that she can and does walk outside her home at night. (Re 98, PageID 1463).

house at night). In fact, since *Livingston*, courts in the Ninth Circuit have clarified that the *Livingston* opinion should not be interpreted as saying that driving is a major life activity. *Szwanek v. Jack in the Box, Inc.*, No. C 20-02953 WHA, 2020 WL 5816752, at *3–4 (N.D. Cal. Sept. 30, 2020) ("Plaintiffs' reliance on our court of appeals' unpublished opinion in *Livingston v. Fred Meyer Stores, Inc.*, 388 F.App'x 738 (9th Cir. 2010), is misplaced. There, our court [of] appeals held that 'seeing' was undoubtedly a major life activity, but explicitly held off considering the plaintiff's alternative argument that 'her vision impairment substantially limit[ed] her major life activit[y] of . . . driving[.]'"), *aff'd*, No. 20-16942, 2021 WL 5104372 (9th Cir. Nov. 3, 2021). The *Colwell* case also refrained from reaching the issue of whether driving was a major life activity. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) ("It may be that driving and driving at night are not major life activities, but that is not the question presented here . . . .").

The fourth opinion the District Court relied on is *Harris v. MatureCare of Standifer Place, LLC*, No. 1:14-CV-64, 2015 WL 4662441 (E.D. Tenn. Aug. 5, 2015), which found that an employee who could not drive to and from work was disabled on that basis alone. Shelby County respectfully submits that *Harris* is simply inconsistent with the majority perspective on this point, and that the *Wade* and *Sedarous* opinions reach the correct result instead. The *Harris* ruling makes no mention of *Wade* or *Sedarous*. And, like *Colwell*, the *Harris* opinion does not

address whether driving itself is a major life activity. *Harris, LLC*, 2015 WL 4662441, at *3.

Here, Plaintiff Edwards did not submit that she cannot see at all at night, or that her alleged night blindness seriously impacts her ability to do anything other than drive.[8] The courts that have reviewed this issue have predominantly found that this is not a major life activity, and therefore is not covered under the ADA's definition of disability. Shelby County respectfully submits that this Court should reach the same conclusion.

## B.    Even If Night Blindness Were A Disability And Even If Driving Were A Major Life Activity, An Employee Who *Can* Drive At Night Does Not Suffer From That Disability.

Perhaps the biggest elephant in the room in this case is the fact that Plaintiff Rebecca Edwards can, has, and continues to drive at night. Therefore, even if the ADA did contemplate a disability for some categories of unable-to-drive-at-night employees, a person who ***can*** perform this function is not legally disabled under the ADA.

In order for a major life activity to be substantially limited under the ADA, the individual must be either "unable to perform a major life activity that the average

---

[8] The only thing other than driving Plaintiff even remotely referenced was difficulty seeing for a matter of minutes after she has been exposed to bright lights in darkness. (RE 98, PageID 1383, 1402). She did not clarify how this is significantly different than what most people experience in similar situations.

person in the general population can perform or [be] significantly restricted as to the condition, manner or duration under which the average person in the general population can perform that same major life activity." *Thompson v. UGL Unicco Serv. Co.*, 750 F. Supp. 2d 907, 914 (W.D. Tenn. 2010), *aff'd sub nom. Thompson v. UGL Unicco*, 472 F. App'x 396 (6th Cir. 2012). "A substantial limitation of such an activity exists when the individual's ability to perform that activity is ***limited to a large degree***." *Id.* (emphasis in original). It is "not enough for the impairment to cause merely ***moderate or intermittent interruptions*** in the performance of the activity." *Brady v. Potter*, 273 F. App'x 498, 502 (6th Cir. 2008) (emphasis added).

Here, Plaintiff repeatedly conceded at trial that she can and still does drive at night. The locations she drives to include her mother's house, three different Kroger grocery stores in the area, a Superlo grocery store, a Walgreens pharmacy, and "any kind of fast food" restaurants as long as she takes back streets. (RE 98, PageID 1401, 1463-64). She even testified that she can and has driven ***for Shelby County*** on the highway at night. She tried to establish caveats to this—namely, that in those cases she was escorted by police and had a passenger co-worker in the car. But she gave no real explanation for how having passengers in her car helped her to see. Plaintiff is not substantially limited in a major life activity.

To allow Plaintiff's claim here to go to a jury unduly expands what it means to have an ADA disability. It essentially suggests that a person who can drive, but

27

not under any and all conditions, is disabled. As the *Wade* opinion suggests, this goes too far. Plaintiff's claim of a night blindness disability should not have been presented to a jury.

## II.    Plaintiff Did Not Make A Good-Faith Request For An Accommodation For Night Blindness Because She Can Drive At Night.

Plaintiff's request for an accommodation based on night blindness was not made in good faith, and was therefore not protected conduct under the ADA. Even if night blindness is not a disability, an employee still receives protections under the ADA for protected conduct, including requests for accommodations. However, those requests must be made in good faith. Plaintiff's was not.

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) she engaged in a protected activity under the ADA; (2) the employer knew of this activity; (3) the employer took adverse action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse action. *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). While a request for accommodation can be a protected activity, it must be a **good-faith** request for reasonable accommodations. *Hurtt v. Int'l Servs., Inc*., 627 F. App'x 414, 423 (6th Cir. 2015) (The "pertinent inquiry" of the protected-activity element is "not whether [the plaintiff] proved he had a disability under the ADA, or whether [the defendant] had specific knowledge of [the plaintiff's] alleged disability, but rather,

whether [the plaintiff] showed a good-faith request for reasonable accommodations.").

Courts have found that an employee's request for an accommodation is not made in good faith when the employee knows they are not actually disabled and are instead using a false claim of disability as cover to seek an accommodation for some other, non-ADA protected reason. *See, e.g.*, *Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 677 (5th Cir. 2008) ("Because [plaintiff] has not shown that he had a good faith belief that he was disabled or perceived as disabled, his request for an accommodation cannot be considered protected by the ADA."); *Sulima v. Def. Support Servs., LLC*, No. 3:06-CV-415, 2008 WL 11492969, at *13 (M.D. Pa. Oct. 30, 2008) ("We conclude Plaintiff cannot show he engaged in protected activity in this case because there is no evidence from which a factfinder could conclude Plaintiff [ ] had a reasonable, good faith belief that he was disabled or perceived as disabled."), *aff'd sub nom. Sulima v. Tobyhanna Army Depot*, 602 F.3d 177 (3d Cir. 2010). Courts have recognized that "the ADA does not extend to an employee whose request is motivated by something other than a good faith belief that he/she needs an accommodation. Congress clearly did not intend to extend the reach of the ADA's umbrella to employees whose motivation for requesting an accommodation is something other than a good faith belief that an accommodation under the Act is

necessary or appropriate." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191

(3d Cir. 2003)

In this case, Plaintiff had one clear reason for not wanting to work the late

shift to which she was assigned: crime. She made clear to management multiple

times that she was disturbed by crime at the worksite. When she received her late

shift assignment, she emailed those concerns to Suttle. (Trial Exhibit 6, October 5,

2021 Email from Plaintiff) (". . . I would like to inform you that this location is not

safe due to drug dealing, prostitution and other violent crimes . . . Based on me being

a female working alone from 3:00 PM – 11:30 PM, I consider this hazardous to my

well-being. All other assignments of this nature, I was accompanied by a co-

worker(s) and escorted by Memphis Police Officers and Shelby County Sheriffs.").

She made no mention of difficulty driving at night in that email.

In fact, even at trial, her testimony revealed the reality that her real concern

was crime, and that crime was why she left the worksite early, but not early enough

to get home before dark. (RE 98, PageID 1398) ("I just started getting scared. When

I drove up that day . . . [t]here was a suspicious character I'd never seen before. And

I just started thinking all kinds of thoughts like, okay, if he pulls me in, nobody will

miss me. What am I going to do? So around somewhere between 8:00 and 8:30 I

just got in the car and I drove home."). Her concerns were not about night blindness.

And, most problematically, this was not good faith because she knew she actually ***could*** drive at night. She admitted that her statement to Suttle that she "can't see driving at night" simply wasn't true. (RE 98, PageID 1374-75) (". . . her first response to me was, you've driven at night before." Question: "And was that true?" Answer: Yes, I had driven at night. But when I drove at night—and I explained to her—I drove—we were escorted by the police, the sheriff, and then there was always a coworker with me. And it wasn't every night . . . ."). And in fact, she drove and still drives ***many*** places at night. These include her mother's house, three different Kroger grocery stores in the area, a Superlo grocery store, a Walgreens pharmacy, and "***any*** kind of fast food" restaurants as long as she takes back streets. (RE 98, PageID 1401, 1463-64) (emphasis added). As a matter of law, her request was not a good faith request for an accommodation because it sought to accommodate a disability she knew she did not really have. Plaintiff's retaliation claim should not have gone to the jury.

## III.    Plaintiff's Asthma Is Not A Disability Under The ADA.

Under this Court's recent ruling in *Andrews*, Plaintiff's asthma failure-to-accommodate claim failed as a matter of law and should not have been presented to the jury. The entire basis for Plaintiff's asthma claim was that she ran out of medicine, had a sleepless night as a result, and requested a single, isolated one-day

accommodation which she did not receive. Her description of her asthma did not constitute an ADA disability as a matter of law.

Asthma can be the basis of an ADA claim only if the condition rises to the level of a substantial limitation on a major-life-activity. "Suffering from asthma, however, does not constitute a *per se* substantial limitation on the major life activity of breathing . . . ." *Boker v. Sec'y, Dep't of Treasury*, No. 1:07-CV-446, 2009 WL 3199074, at *5 (S.D. Ohio Sept. 29, 2009). "Asthma has typically been found to rise to the level of a substantial limitation on the major-life-activity of breathing where the plaintiff has a long history of asthmatic attacks and endures numerous and severe restrictions on daily activities as a result of the condition." *Id.* at *3. Where a plaintiff "suffers asthma attacks only in response to particular stimuli and is able to engage in almost all normal life activities, courts have been less likely to conclude that the plaintiff is substantially limited in the major-life-activity of breathing." *Id.* (collecting cases).

Recently, this Court considered a similar case involving a plaintiff with asthma. *Andrews v. Tri Star Sports & Ent. Grp., Inc.*, No. 23-5700, 2024 WL 3888127 (6th Cir. Aug. 21, 2024). The plaintiff in *Andrews* claimed her employer "discriminated against her because she suffers from asthma." *Id.* at *1. Andrews' asthma was "well controlled." *Id.* But she experienced symptoms related to her asthma in response to certain stimuli, like smelling Lysol spray. *Id.* The plaintiff in

*Andrews* testified that her "asthma **can** limit her breathing – but only in these transient, isolated, or 'extra strenuous' circumstances." *Id*. at \*5 (emphasis in original). The Court found that "these types of limitations are not 'substantial' when compared to the average person." *Id*. Andrews did not provide an expert or medical provider to testify about her condition or limitations. *Id*. at \*4. Ultimately, this Court concluded that "Andrews did not describe the impact of her asthma as severe enough to qualify as a 'substantial limitation' on her breathing." *Id*.

The facts here are like those in *Andrews*. Plaintiff was diagnosed with asthma in 2018. (RE 98, PageID 1357). She has only ever had one asthma attack, which took place in 2018 and led to her diagnosis. *Id.* She takes Breo and other medicines that are for "maintenance." (RE 98, PageID 1355). She testified that there were things that she believed "**could** happen" to cause an asthma attack, such as smelling perfumes or marijuana smoke. (RE 98, PageID 1467) (emphasis added). But she conceded that these things had never actually happened, and she has never actually had another attack. *Id; see generally* RE 98, PageID 1466 (Question: "Do you recall testifying during [your] deposition that if you had your asthma medication you were good, I think is what you said?" Answer: "I said, yeah, it's controlled to an extent . . .").

Moreover, the event that gave rise to her failure-to-accommodate claim was limited to a single day, and arose because she ran out of her medication. This event

was "transient" and "isolated," *Andrews,* 2024 WL 3888127, at *5, and not enough to amount to a disability. Plaintiff's asthma failure-to-accommodate claim should not have been presented to the jury.

## CONCLUSION

Plaintiff alleged she is disabled due to night blindness because she is unable to drive at night, even though she actually does drive at night. And she alleged she is disabled due to asthma based on a single-day incident when she ran out of medication for an otherwise mild and controllable version of asthma. Under the ADA, neither of these conditions amounted to a disability, and the claims stemming from them should not have been presented to the jury. Shelby County respectfully requests that the judgment against it be reversed.

Respectfully submitted,

*E. Lee Whitwell*
E. LEE WHITWELL (TN 33622)
lee.whitwell@shelbycountytn.gov
R. H. "CHIP" CHOCKLEY (TN 20680)
chip.chockley@shelbycountytn.gov
JULIA MARIE HALE (TN 37204)
julia.hale@shelbycountytn.gov
Shelby County Attorney's Office
160 North Main, Suite 950
Memphis, Tennessee 38103
(901) 222-2100

*Attorneys for Shelby County, Tennessee*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the type-volume limitation provided in Fed. R. App. P. 32(a)(7)(B). The foregoing brief contains 9,720 words of Times New Roman (14 point) proportional type. The word processing software used to prepare this brief was Microsoft Word Office 2016.

*/s/ E. Lee Whitwell* _____

## **CERTIFICATE OF SERVICE**

I certify that the foregoing is being filed via the Court's ECF system this 15th day of November, 2024, for service on all persons registered in connection with this case.

*/s/ E. Lee Whitwell* _____

## <u>DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS</u>

| <u>Record Entry</u> | <u>Description of Document</u> | <u>Page ID # Range</u> |
| --- | --- | --- |
| 1 | Complaint | 1-25 |
| 22 | Amended Complaint | 79-103 |
| 38 | Motion for Summary Judgment | 162-163 |
| 38-2 | Memo in Support of Summary Judgment | 168-186 |
| 71 | Jury Trial Minute Entry | |
| 72 | Jury Trial Minute Entry | |
| 73 | Jury Trial Minute Entry | |
| 77 | Exhibit List | 1073-1074[9] |
| 78 | Judgment | 1075 |
| 85 | Notice of Appeal | 1108-1109 |
| 95 | Order on Motion to Stay | 1140-1143 |
| 97 | Trial Transcript Day 1 | 1144-1338 |
| 98 | Trial Transcript Day 2 | 1339-1544 |
| 99 | Trial Transcript Day 3 | 1545-1766 |
| 100 | Trial Transcript Day 4 | 1767-1827 |

---

[9] Appellant references trial exhibits 6, 12, 15, 16, 19, 20, 22, 23, and 24, listed on Exhibit List RE 77. These exhibits were retained by the District Court.