No. 24-5730

# In the United States Court of Appeals for the Sixth Circuit

**REBECCA EDWARDS**

Plaintiff-Appellee

v.

**SHELBY COUNTY, TENNESSEE**

Defendant-Appellant,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE (MEMPHIS)

Docket No.: 2:22-cv-02682-tmp

## BRIEF OF PLAINTIFF-APPELLEE REBECCA EDWARDS

STEVEN G. WILSON
Tenn. Bar #028460
The Steve Wilson Firm
5100 Poplar Ave., Ste 2700
Memphis, TN 38137
Tel.: (901) 337-1300
steve@stevewilsonfirm.com

MATTHEW C. GULOTTA
Tenn. Bar #028194
The Gulotta Firm, PLLC
202 Adams Ave.
Memphis, TN 38103
Tel.: (901) 213-6648
matt@gulottalaw.net

1

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................2

TABLE OF AUTHORITIES ........................................................................4

STATEMENT WAIVING ORAL ARGUMENT ......................................7

JURISDICTIONAL STATEMENT ............................................................7

STATEMENT OF THE ISSUES..................................................................7

STATEMENT OF THE CASE ......................................................................8

    1.   Introduction.................................................................................. 8

    2.   Ms. Edwards' Employment.................................................... 10

    3.   Ms. Edwards' Asthma ............................................................ 12

    4.   Ms. Edwards' Request for a Modified Shift............................ 15

    5.   The Alleged Investigation and Termination............................ 16

    6.   Procedural History ................................................................. 22

SUMMARY OF ARGUMENT ..................................................................25

    1.   Ms. Edwards' night blindness is a disability........................... 25

    2.   Ms. Edwards' asthma is a disability........................................ 27

    3.   Retaliation for Ms. Edwards' requested accommodation ......... 27

STANDARD OF REVIEW ........................................................................29

LAW AND ARGUMENT ..........................................................................31

  I.   There was sufficient evidence for a reasonable juror to find that Ms. Edwards' night blindness was an actual and "regarded as" disability under the ADA ...................................... 31

    A.   There was sufficient evidence for a reasonable juror to find that Ms. Edwards' night blindness was a "regarded as" disability under the ADA, as amended ................................ 32

    B.   There was sufficient evidence for a reasonable juror to find that Ms. Edwards' night blindness was an "actual" disability under the ADA, as amended ....................................... 36

2

C.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards' night blindness is a disability despite her acknowledgment of driving on several occasions ........ 46

II.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards requested a reasonable accommodation in good faith due to her night blindness ..................................... 48

III.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards' asthma was an "actual" disability under the ADA .............................................................. 53

CONCLUSION ..................................................................................................... 58

CERTIFICATE OF COMPLIANCE ...................................................................... 60

CERTIFICATE OF SERVICE ............................................................................... 60

ADDENDUM (DESIGNATION OF DOCUMENTS) ........................................... 61

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Andrews v. Tri Star Sports & Ent. Grp., Inc.*, No. 23-5700, 2024 WL 3888127 (6th Cir. Aug. 21, 2024) ............................................................57

*Arnold v. Wilder*, 657 F.3d 353 (6th Cir. 2011)........................................29

*Baker v. Windsor Republic Doors*, 414 F. App'x 764 (6th Cir. 2011)...................49

*Bard v. Brown Cnty., Ohio*, 970 F.3d 738 (6th Cir. 2020) .....................................33

*Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196 (1998) ......................................38

*Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501 (6th Cir. 2016) ........................30

*Bryson v. Regis Corp.*, 498 F.3d 561 (6th Cir. 2007)..............................................49

*Capobianco v. City of New York*, 422 F.3d 47 (2d Cir. 2005) ........ 35, 41-42, 46, 51

*Carini v. Jacobs Eng'g Grp., Inc.*, No. 3:22-cv-787, 2024 WL 4226911 (D. Conn. Sept. 18, 2024) ...................................................................51

*Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775 (6th Cir.1998) ...................................................................................38

*Colwell v. Rite Aid Corp.*, 602 F.3d 495 (3d Cir. 2010)............................ 43, 45, 51

*Equal Emp. Opportunity Comm'n v. Charter Commc'ns, LLC*, 75 F.4th 729 (7th Cir. 2023) .................................................................. 43, 51

*Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC,* 974 F.3d 767 (6th Cir. 2020) ..................................................................................................33

*Harris v. MatureCare of Standifer Place, LLC*, No. 1:14-cv-64, 2015 WL 4662441 (E.D. Tenn. Aug. 5, 2015) .................................................... 35, 44, 46

*Heisler v. Metro. Council*, 339 F.3d 622 (8th Cir. 2003) .......................................49

*Hostettler v. College of Wooster*, 895 F.3d 844 (6th Cir. 2018) .... 31-32, 36, 37, 40, 54, 56

*J.C.Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474 (6th Cir. 1991)..30

*Livingston v. Fred Meyer Stores, Inc.*, 388 F. App'x 738 (9th Cir. 2010) 35, 42, 45, 51

*Morrissey v. Laurel Health Care Co.*, 946 F.3d 292 (6th Cir. 2019).............. 39, 56

*Mosby-Meachem v. Memphis Light, Gas & Water Division,* 883 F.3d 595 (6th Cir. 2018) ........................................................................................ 29-30

*Preferred Rx., Inc. v. American Prescription Plan, Inc.*, 46 F.3d 535 (6th Cir. 1995) ....................................................................................................33

*Roush v. Weastec, Inc.*, 96 F.3d 840 (6th Cir. 1996).................................................41

*Schlosser v. VRHabilis, LLC*, 113 F.4th 674 (6th Cir. 2024) ..................................30

*Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249 (10th Cir. 2001) ................49

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002) ............................41

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006)....................33

*Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150 (6th Cir. 1995) .............30

## Statutes

28 U.S.C. § 1291 ...........................................................................................7

28 U.S.C. § 1331 ...........................................................................................7

28 U.S.C. § 41 ...............................................................................................7

42 U.S.C. § 12101 .........................................................................................7

42 U.S.C. § 12102 ..................................................................31, 34-41, 53-55, 57

42 U.S.C. § 12112 .......................................................................................33

42 U.S.C. § 12201 .......................................................................................34

42 U.S.C. § 1983 .........................................................................................23

Pub. L. 110-325, § 2 ............................................................................. 37, 44

## Other Authorities

29 C.F.R. § 1630.2 ............................................32, 34, 37-38, 44, 47, 56

6th Cir. R. 34 ...............................................................................................7

Fed. R. App. P. 32 ......................................................................................60

Fed. R. App. P. 34 ........................................................................................7

Fed. R. Civ. P. 50 ...................................................24, 29-30, 32, 33, 59

## STATEMENT WAIVING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a) and 6th Cir. R. 34(b)(2), an oral argument is not requested as the facts and laws are fully addressed in the brief.

## JURISDICTIONAL STATEMENT

This appeal arises from a trial and jury verdict in favor of Plaintiff-Appellee in the U.S. District Court for the Western District of Tennessee. Ms. Edwards pursues her claims under the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 *et seq*. The district court exercised federal question jurisdiction under 28 U.S.C. § 1331. The County filed its *Notice of Appeal* on August 9, 2024. (R. 85, PageID 1108). The Sixth Circuit has appellate jurisdiction pursuant to 28 U.S.C. § 1291. Further, the Western District of Tennessee is in the Sixth Circuit. 28 U.S.C. § 41.

## STATEMENT OF THE ISSUES

I.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards' night blindness was an actual and a "regarding as" disability under the ADA

II.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards requested a reasonable accommodation in good faith due to her night blindness

III.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards' asthma was an "actual" disability under the ADA

## STATEMENT OF THE CASE

### 1.    Introduction

Plaintiff Rebecca Edwards suffers from night blindness. This medically diagnosed condition affects her ability to safely drive at night, to see, to read, and to concentrate. On October 4, 2021, Ms. Edwards' manager at Shelby County, Susie Suttle, told her to work until 11 p.m., after which time she would need to drive home on the freeway. Ms. Edwards replied that she suffered with night blindness—nyctalopia—and she could not drive at night. She asked for her shift to be changed. Ms. Edwards agreed to obtain a doctor's note for Ms. Suttle. However, the very next morning, despite no history of discipline, Manager Suttle began seeking Ms. Edwards' termination. Ms. Suttle terminated Ms. Edwards on October 11 (effective October 8) based on Ms. Suttle's investigation into several untrue allegations made *by Ms. Suttle*. The County thus discriminated against Ms. Edwards because of her disability—night blindness—and retaliated against her because she requested a reasonable accommodation, a shift modification based on her night blindness.

At trial, the jury heard Ms. Edwards explain she had driven at night when she "had to"—in the local area to her home and using back roads to attend to her mother then suffering with Alzheimer's, and to collect food and medication. She also acknowledged she drove at night on several occasions in early 2021 as directed by the County, though she clarified she was only able to perform this task by following the taillight of an escorting sheriff deputy and assisted by a coworker, that it made her afraid, and she was relieved when the County told her she no longer had to perform the task.

Based on the evidence, including credibility of the witnesses, a jury found Ms. Edwards' night blindness was a disability. The jury made this determination following the jury instructions agreed on by the parties, ultimately finding the County liable for discrimination, specifically termination, because of Ms. Edwards' disability of night blindness, and retaliation by terminating Ms. Edwards mere days after she requested a reasonable accommodation.

A jury also found Ms. Edwards' suffered with asthma, which was a disability, and the County liable for failing to reasonably accommodate her request for one day of leave because of her asthma. Ms. Edwards was hospitalized with the condition in 2018, and she was subsequently required to remain on medication. In September 2021, having run out of asthma medication, she became so weak she

was unable to sleep, breathe normally, or physically move from room to room within her home. As a result, Ms. Edwards called Manager Suttle and told her about her asthma, lack of medication, coughing, and inability to sleep. She also requested leave for the day to recover—which she was entitled to pursuant to County policy. Manager Suttle refused to discuss the request and demanded Ms. Edwards show up for her assigned shift. The jury determined Ms. Edwards' requested accommodation posed no undue hardship on the County. (*Verdict Form*, R. 74, p. 2).

## 2.    Ms. Edwards' Employment

Ms. Edwards was hired by the Shelby County Health Department as a COVID-19 Tracer in July 2020. (*Trial Transcript Day 1*[1], R. 97, PageID 1301). In December 2020, she was promoted to Environmentalist Inspector. (*Trial Transcript*, Day 3, R. 99, PageID 1610, 612-13). Between January and March 2021, Ms. Edwards was tasked on several occasions with driving at night. (*Trial Transcript Day 2*, R. 98, PageID 1375). Despite being afraid, she managed to perform this task when accompanied by a coworker and following the taillights of the escorting sheriff deputy driving in front of her. (*Id.* at 1376).

---

[1] The *Trial Transcripts* [Days 1 through 4] are found in the record at R. 97 through 100, respectively.

10

In March 2021, Ms. Edwards was reassigned when the Health Department ended its COVID-19 inspection protocol. (R. 97, PageID 1306). At this time, the County no longer asked her to drive at night and she was relieved because the task made her feel unsafe. (*Trial Transcript Day 2*, R. 98, PageID 1376). The prospect of driving at night did not come up again until October 2021 because inspections only happened in the daytime. (R. 98, PageID 1377).

In August 2021, the County's fourteen environmentalists, including Ms. Edwards, were divided into teams at the County's Dividend location. (R. 98, PageID 1365). Ms. Edwards was assigned to the Care Coordination Team, along with two new co-workers, Velma Thomas and Nick Ayers. They reported to Manager Susie Suttle, based at the Dividend [or Dividend Drive, the address of the office]. (R. 97, PageID 1307). The job of the team involved transporting food and supplies to the patients based at the Econo Lodge under quarantine due to COVID. (R. 99, PageID 1655; *Jury Instructions*, R. 75, PageID 1051, ¶5).

On October 8, 2021, the County issued a Separation Notice to Ms. Edwards, but Ms. Suttle did not inform her until of termination until October 11, 2021. (R. 98, PageID 1413-14).

3.    **Ms. Edwards' Asthma**

Ms. Edwards was diagnosed with asthma in 2018 following a visit to the emergency room, and three days hospitalization, because she was unable to breathe. (R. 98, PageID 1357). Specifically, a pulmonologist told her she was "a train wreck waiting to happen." (*Id.*).

In December 2020, as part of her pre-employment physical exam, Ms. Edwards informed the County she suffered from asthma. (*Id.* at 1354-56). She took Breo and Montelukast, medications to help her breathe. (*Id.*).

On September 8, 2021, Ms. Edwards notified the County at a meeting that she suffered difficulty moving from her bedroom to her bathroom when her asthma was active. (R. 97, PageID 1323). For over a week prior to September 15, 2021, Ms. Edwards was looking for Breo medication to help her breathe, but nobody in the city had it. (R. 98, PageID 1355-56). By September 15, she had been unable to sleep almost all night because of her coughing and wheezing caused by asthma. (*Id.* at 1356-57). Indeed, her wheezing was so pronounced she heard it as a loud whistle. (*Id.*). Her breathing was so limited she suffered difficulty physically moving about in her home, from her bedroom to her bathroom. (*Id.* at 1357-58). She used her rescue inhaler and tried an alternative medication to Breo prescribed by her

pulmonologist, but it did not work. (*Id.* at 1358). Her asthma was also made worse because it was raining that night. (*Id.* at 1360).

As a result of her difficulty breathing, sleeping, and walking within her own home because of her asthma, Ms. Edwards called her manager, Ms. Suttle, to request a day of leave, first by voicemail at 4:30 a.m. and again at 7:30 a.m. when Ms. Suttle called her. (*Id.* at 1359-60). Ms. Edwards told Ms. Suttle that she was coughing and had not slept because of her asthma, and did not have her Breo medication. (*Id.*). Ms. Edwards was scheduled to work at 8:30 a.m. (*Id.*). After her request for one day of leave was rejected (*Id.* at PageID 1360), Ms. Edwards went to work despite a lack of sleep, feeling feeble, and coughing and wheezing. (*Id.* at 1367-68). By contrast, Ms. Suttle claimed no "recollection" of Ms. Edwards stating she suffered from asthma. (*Id.* at 1519; R. 99, PageID 1576).

County policy states an employee must call at least thirty minutes before a shift begins if the employee is unable to make it to work. (R. 98, PageID 1362). Although Ms. Suttle claimed she had no memory of the request by Ms. Edwards, she agreed Ms. Edwards was entitled to take the day off sick if she called thirty minutes before her shift started based on the County Employee Handbook. (R. 98, PageID 1517-19).

Further, within three weeks of the denial of a sick day, Ms. Suttle emailed Ms. Edwards requesting she cover a co-worker's request for two days off work to celebrate her birthday. (*Id*. at 1363-64). In her email, Ms. Suttle explained to Ms. Edwards that other environmentalists could be asked to assist if the County received additional patients. (*Id.* at 1363-64). Ms. Edwards regarded this as normal. (*Id.* at 1366-67). There were fourteen environmentalists in total, including Ms. Edwards and her two co-workers (*Id.* at 1365). Ms. Edwards previously witnessed other environmentalists cover days off to deliver meals to the Econo Lodge. (*Id.* at 1365-67). She had also previously worked nine days straight so her two co-workers could take a day off. (*Id.* at1365).

Ms. Edwards carries her rescue inhaler at all times. (*Id.* at 1466). While the Breo helps her breathe, it will not prevent an asthma attack triggered by certain perfumes or marijuana smoke. (*Id.* at 1466-1467). When she is "around ... smoke [or certain other substances - perfumes], [she is] going to have an asthma attack, and then [she is] going to have to use the rescue inhaler." (*Id.* at 1466). She can use her rescue inhaler twice but will need to go to the emergency room if it does not work. (*Id.).* In October 2021, Ms. Edwards would try to go for walks and, if not having breathing issues, could keep her home clean and shop for groceries. (*Id.* at 1467-68).

### 4.    Ms. Edwards' Request for a Modified Shift

On October 4, 2021, when Ms. Edwards returned to work, she was assigned by Ms. Suttle to a new shift, 3 p.m. to 11 p.m., alone at the Econo Lodge. (R. 98, PageID 1373). Ms. Edwards immediately responded to Ms. Suttle, "I can't work that shift. Number one, I can't see driving at night. I have nyctalopia. I have night blindness. I cannot work that shift. And then it's not safe out there, a woman by herself." (*Id.* at 1374). Ms. Suttle quarreled back that Ms. Edwards had driven at night in the past. (*Id.* at 1375-76). Indeed, Ms. Edwards had driven at night several times as part of her job between January and March 2021. (*Id.*). However, Ms. Edwards clarified she was only able to drive on such past occasions because she was with a co-worker and a police escort, and she was able to follow their taillights. (*Id.* at 1376). She was relieved when this job assignment ended because she felt unsafe driving, and the issue of driving at night did not arise again until October 4. (*Id.* at 1376-77).

Next, during their conversation on October 4, Ms. Suttle asked Ms. Edwards to produce a doctor's note to confirm her night blindness. Ms. Edwards agreed. (R. 98, PageID 1379). Ms. Edwards immediately called her ophthalmologist, but she was out of town. (*Id.* at 1380). By contrast, Ms. Suttle claims she did not ask for a doctor's note, but rather Ms. Edwards stated she could not drive from the Econo

15

Lodge at night and Ms. Edwards told her she would bring a doctor's note. (*Id.* at 1494). Ms. Suttle claims Ms. Edwards did not explain to her the basis for this doctor's note or what it would say. (*Id.*).

By contrast, Ms. Crutchfield, Senior HR of Shelby County, who was present throughout the trial as the County's representative, reviewed an email from October 2021 that Ms. Edwards suffered from night blindness and told Cassandra Brown, Administrator of the COVID-19 response team, to have Ms. Edwards provide medical documentation. (R. 99, PageID 1604-05; 1607).[2] While Ms. Crutchfield wanted the medical documentation to verify Ms. Edwards' suffered from a condition that needed accommodation or had restrictions, County management decided to modify Ms. Edwards' shift to accommodate her. (*Id.* at 1644). Ultimately, Ms. Crutchfield admitted she was aware of Ms. Edwards' night blindness. (*Id.* at 1644-45).

### 5.    The Alleged Investigation and Termination

On the morning of October 5, 2021, Ms. Suttle met Ms. Kmet, her immediate superior. (*Id.* at 1650-51). Ms. Kmet was directly below Cassandra Brown in the

---

[2] On cross-examination by the County, Ms. Crutchfield's testimony slightly differed. "Q. Now, did you receive any communications regarding Ms. Edwards having an issue with night blindness or driving at night? A. Not until the discussion with Ms. Brown. Q. And I – and this was right around the time of her termination; is that right? A. That is correct." (*Id.* at 1622:19-25).

chain of command. (*Id.*). Ms. Kmet recalls Ms. Suttle stating her concerns about Ms. Edwards' performance and her safety concerns about working the night shift. (*Id.* at 1651-52). Ms. Suttle admitted, "We were discussing firing her." (R. 98 PageID 1481).

Explaining her knowledge of Ms. Edwards' night blindness, Ms. Kmet stated, "I was notified that she had safety concerns and that she didn't feel safe driving at night and maybe that she didn't -- couldn't see -- felt she couldn't see well or that she couldn't see well and, therefore, felt she couldn't – wasn't safe driving. **Q.** Okay. And you asked for a medical excuse, right? **A.** I personally did not ask for a medical excuse, but [Suttle] had already, I think at that point, indicated to me she asked her for a medical excuse." (R. 99, PageID 1653-64; *see also* at 1666). Later, at 11:45 a.m. on October 5, Ms. Kmet received a follow-up email from Ms. Suttle making allegations against Ms. Edwards going back to August 2021. *(Id.* at 1669; R. 98, PageID 1481-82). In the end, Ms. Kmet elevated the issue to her leadership, and Ms. Edwards' shift was modified on October 6, 2021. (R. 99, PageID 1655).

Regarding her alleged work conduct and performance issues, Ms. Kmet only knew what Ms. Suttle had told her. (*Id.* at 1668). At trial, Ms. Suttle's credibility was significantly undermined. For example, Suttle made allegations in support of Ms. Edwards' termination that were not covered in any of her two reports on October

5th and 7th, respectively, or in the termination paperwork on October 8th, apparently, because she "just forgot." (R. 98, PageID 1501, 1508-09; R. 99, PageID 1561-62; 1591-94). Further, Ms. Suttle consistently asserted she was unable to recall the details about her own written allegations against Ms. Edwards, claiming it was because two years had passed (R. 98, PageID 1489-90, 1492, 1496), and when the factual basis of her allegations were undermined, she suggested she may have noted the wrong dates. (*Id.* at 1492-93; 1497-98).

Further, Ms. Suttle insists Ms. Edwards claimed to her she could not drive at night, but did not recall her claiming she suffered from night blindness. (*Id.* at 1494-95; *Day 3*, R. 99, PageID 1578-80; 1578; 1596-1597). While acknowledging Ms. Edwards told her she had a doctor's note, Ms. Suttle claims there was no discussion about what the doctor's note stated. (*Id.* at 1597). Ms. Suttle did admit that within twenty-four hours of her conversation with Ms. Edwards on October 4, she emailed management to "see what direction did we want to go because of her behaviors and the type of employee she was" and '[she] made a decision … [t]hat there was nothing else that I could do or work with her because she was not going to do what she was supposed to do." (*Id.* at 1598). By October 6 at 1:53 p.m., Ms. Suttle emailed Ms. Kmet an updated revised report, including further allegations against Ms. Edwards. (R. 98, PageID 1499-1501).

18

Ms. Edwards first encountered the effects of night blindness when driving in 2014, specifically, she "just couldn't see" and "could not drive." (*Id.* at 1381-82). She testified that with night blindness, bright street and traffic lights are blinding, and there are "halos around [] street lights and traffic lights," making it "hard to see" if there was a barricade or street lines. (*Id.).* These issues make her unable to read road signs such as exit markers. (*Id.).* As a result, she would drive much slower than during daylight hours and finds it very stressful because she feels she could hurt somebody or herself. (*Id.* at 1382). Her condition became worse over the years. (*Id.* at 1381). Ultimately, she was diagnosed with night blindness by a medical professional. (*Id.* at 1462). By October 2021, Ms. Edwards suffered night blindness even when she was a passenger in a vehicle. (*Id.* at 1383). Subsequently, her eyes needed to then adjust, leaving her unable to read a menu, for example. (*Id.*).

On October 5, 2021, Ms. Suttle called Ms. Edwards three or four times before her new shift began to ask, "Are you refusing to work today?" (*Id.* at 1386). On the last call, Ms. Edwards stated she would work the shift, but under protest. (*Id.* at 1387). Ms. Suttle however, had already met with Ms. Kmet to discuss Ms. Edwards' termination. (R. 98 PageID 1481).

As her shift progressed, Ms. Edwards grew more anxious, hoping "nobody tries to mess with me, and then how am I going to drive home, how am I going to

19

make it out of here." (*Id.* at 1388). Ms. Edwards was not familiar with her right to request a reasonable accommodation under the Americans with Disabilities Act. (R. 98, PageID 1397). However, at this stage, feeling her concerns were ignored, Ms. Edwards next emailed Ms. Suttle, Ms. Kmet, and the interim director of the COVID unit, Ms. Hall. (R. 98, PageID 1391; 1397). The email unquestionably focused on the lack of safety at the Econo Lodge area due to crime, but crucially begins, "Ms. Suttle, per our conversation yesterday and this morning regarding a change in time and location of my shift." (*Id.* at 1392). Here, Ms. Edwards was referring to her conversation with Ms. Suttle on October 4 and her stated reasons she could not work the shift. *(Id.).*

By about 8 p.m. on October 5, Ms. Edwards had grown increasingly afraid, and observed "[t]he sun was -- there was still a little light out. You know, it wasn't dark-dark then, and I just felt it was like the last train home. It's time to go." (*Id.* at 1398). On her journey home, Ms. Edwards drove home very slowly, agitating fellow drivers, including 18-wheeler drivers beginning to ride her, shine and blink their lights at her, further increasing the level of blinding light coming at her through her mirrors. (*Id.* at 1399).

She could not "see the street signs" for when to exit the freeway and she became a nervous wreck. (*Id.).* She saw glares and halos of light, causing her

20

difficulty seeing signs, barricades, blinking, street dividing lines and timely accessing off-turns. (*Id.* at 1400). The anxiety caused by these conditions left her unable to concentrate. (*Id.*). In the end, her drive home took twice as long as the 25-30 minutes during daytime hours. (*Id.* at 1400-01). She got home and sat in her car to gather her thoughts, then went inside and adjusted the lights so her eyes could adjust—though she could not really see the TV or read her mail—and her distress continued to a degree she could not sleep that night. (*Id.* at 1402). The next day, October 6, Ms. Suttle called Ms. Edwards to confirm the shift was modified. (*Id.* at 1404).

Though no time period was specified, Ms. Edwards did explain she had driven at night "if [she] had to" within her local area by taking the back roads to either reach her mother suffering from Alzheimer's, to get medicine, or for food. (*Id.* at 1401, 1463-64). Regarding her mother, Ms. Edwards specified, "there was an occasion where [she] had to go over to her house." (*Id.* at 1463).

On October 8, 2021, the County issued a Separation Notice for Ms. Edwards, erroneously certifying it was issued to her that day. Instead, Ms. Edwards was not informed of her termination until October 11, 2021. (R. 98, PageID 1413-14). Ms. Crutchfield confirms the decision to terminate Ms. Edwards was made by Ms. Brown and Ms. Suttle. (R. 99, PageID 1605).

21

At the time of her termination, Ms. Edwards was provided a Disciplinary Action Form. (R. 98, PageID 1415). The Disciplinary Action Form set out allegations against Ms. Edwards "[b]ased on information from Ms. Susie Suttle," though confirming Ms. Edwards had not "been previously disciplined for repeated or related conduct." (R. 98, PageID 1415-16). After Ms. Suttle read through the allegations against Ms. Edwards, Ms. Edwards replied that Ms. Suttle was, "a boldfaced liar." (R. 98, PageID 1433). Ms. Suttle shrugged her shoulders and said to Ms. Brown, "see, insubordination." (R. 98, PageID 1433-34). Before the jury at trial, Ms. Edwards systematically refuted every allegation listed against her by Ms. Suttle. (R. 98, PageID 1417-1433). Lastly, the Disciplinary Action Form omitted any reference to Ms. Edwards' statements to Ms. Suttle about night blindness, a doctor's note, an inability to drive at night, or Ms. Edwards' request for her shift to be modified. (R. 98, PageID 1430-31).

## 6.   Procedural History

On April 9, 2022, Ms. Edwards filed a Charge with the Tennessee Human Rights Commission, alleging discrimination based on disability, age, and religious creed, and also retaliation. On August 12, 2022, the Charge was transferred to the U.S. Equal Employment Opportunity Commission. (*Amended Complaint,* R. 22, PageID 81). On January 18, 2023, the EEOC issued a Dismissal and Notice of Right

to Sue. (*Id.*). Ms. Edwards filed this lawsuit on October 7, 2022. (*Complaint*, R. 1). In that suit, she brought claims under 42 U.S.C. § 1983 for alleged violations of her Due Process rights and under the Americans with Disabilities Act (As Amended) for alleged failure to accommodate (regarding her asthma, and night blindness), discrimination (based on her night blindness), and retaliation (based on her request for a reasonable accommodation for night blindness). (*Amended Complaint*, R. 22).

After completion of discovery, Shelby County moved for summary judgment. (*Def's. Mot. for Summ. J.*, R. 38). The District Court granted the motion in part, dismissing Ms. Edwards' § 1983 Due Process claim. (*Order Granting in Part and Denying in Part Def's Mot. for Summ. J.*, R. 54). However, the Court denied the County's motion with respect to the ADA, allowing those claims to proceed to the jury. (*Id.*). The County had argued at summary judgment that Ms. Edwards' ADA claims should not proceed because, among other things, she did not actually suffer from any disabilities. (*Def's Memo. in Support of Mot. for Summ. J.,* R. 38-2, PageID 177-184).

The parties proceeded to a jury trial on July 16, 2024. (*Minute Entry of Proceedings*, R. 71, 72, 73). Ms. Edwards called four witnesses: herself, Susie Suttle, Laviette Crutchfield, and Jennifer Kmet. (*Id.* at R. 71, 72). At the conclusion of Ms. Edwards' proof, Shelby County orally moved for judgment as a matter of law under

23

Fed. R. Civ. P. 50. (*Id.* at. R. 72; R. 99, PageID 1671-1688). The County argued Ms. Edwards had not submitted legally sufficient evidence for a reasonable jury to find her asthma and night blindness constituted disabilities under the ADA. *Id.* The district court denied the motions. (*Id.*).

Shelby County called Velma Thomas as a witness before resting its case. (*Minute Entry*, R. 72). Jury Instructions were agreed on by the parties, including the definitions of disability under the ADA as a person suffering from an actual disability and when "regarded as" disabled. (*Jury Instructions,* R. 75, PageID 1056-59). The County renewed its Rule 50 motion after the jury began its deliberation and that motion was denied. (*Minute Entry*, R. 72).

Subsequently, the jury returned a verdict in favor of Ms. Edwards, awarding her a monetary judgment of $205.46 for nominal damages and $410.92 in compensatory damages for her asthma failure-to-accommodate claim, and $100,410.92 in compensatory damages and $38,009.73 in back pay for her night blindness disparate treatment and retaliation claims (*Judgment* R. 78). As a result, the Court entered Judgment on July 18, 2024, (*Id.*). Shelby County timely appealed. (*Notice of Appeal*, R. 85).

24

# SUMMARY OF ARGUMENT

## 1.    Ms. Edwards' night blindness is a disability

There was sufficient evidence for a reasonable juror to find Ms. Edwards' night blindness was an actual disability, under the ADA, as amended, because this medically diagnosed condition substantially affected her ability to drive, to see, to read, and to concentrate. Her condition affected her ability to read and see *after* driving, when she is at home or at a restaurant. It also affected normal function of her "special sense organs," namely, her eyes. Further, though the County waives the argument, there was sufficient evidence–for a reasonable juror to find Ms. Edwards' night blindness was a "regarded as" disability, under the ADA, as amended.

The County incorrectly argues Ms. Edwards' night blindness only limited her ability to drive, which it claims is not a major life activity under the ADA. It ignores however, all evidence of effects on Ms. Edwards' ability to see, read, concentrate, during and after driving, and on her special sense organs.

Additionally, the County mischaracterizes Ms. Edwards' testimony to argue she could not suffer from medically diagnosed night blindness because she drove at night. First, the County points to several occasions between January and March 2021 when Ms. Edwards did drive at night as part of an assignment set by the

25

County—seven months before she notified her manager in October about her night blindness and was terminated. The County omits that on these several occasions, Ms. Edwards only managed the task because she was accompanied by a co-worker, and she followed the taillights of a law enforcement vehicle escorting her. Further, Ms. Edwards was relieved when the County no longer required her to drive at night in March 2021 because she was believed it was unsafe to drive with her limited ability to see.

Next, the County's argues Ms. Edwards could not suffer night blindness because of a few occasions when Ms. Edwards admitted to driving at night to visit her mother and obtain food or medication. Here, Ms. Edwards clarified that on these limited occurrences, the locations were all local to her home and she would use back roads. Further, she explained that she only drove *when she had to*— to visit her mother who was suffering from Alzheimer's disease, and to obtain food or medication. Ultimately, the jury unanimously found Ms. Edwards credibly and reasonably explained why these select instances of driving at night did not negate her diagnosed night blindness or its effects on her ability to see, read, drive, and concentrate as compared to a normal person in the general population.

**2.      Ms. Edwards' asthma is a disability**

There was sufficient evidence for a reasonable juror to find Ms. Edwards' asthma was an actual disability, under the ADA, as amended, because it substantially limited her ability to breathe, sleep, and physically move about her home. Ms. Edwards was hospitalized with asthma for three days in 2018 and thereafter required by her pulmonologists to remain on two types of medication.

Three years later, in September 2021, after running out of her asthma medication, Ms. Edwards became so physically weak she was unable to sleep, breathe normally, or physically move from room to room within her home. As a result, Ms. Edwards called her manager Ms. Suttle to ask for one day of leave pursuant to County policy. Nonetheless, Ms. Suttle refused to discuss her request and demanded Ms. Edwards turn up for work when her shift started. Based on this evidence, the jury determined Ms. Edwards' asthma was a disability, the County failed to reasonably accommodate her asthma, and the County failed to prove any undue hardship by the prospect of granting Ms. Edwards' request.

**3.      Retaliation for Ms. Edwards' requested accommodation**

There was more than sufficient evidence for a reasonable juror to find Ms. Edwards' request for a reasonable accommodation because of her night blindness was made in good faith. As stated above, Ms. Edwards was medically diagnosed

with night blindness, regardless of limited examples where she did drive at night—local to her home, using back roads, to reach her mother suffering with Alzheimer's disease, or for food and medication. Here, the County simply asks the Court to make a credibility determination on Ms. Edwards' good-faith request to modify her shift because of her night blindness. At trial however, the jury heard the County's attempts to undermine and speculate as to Ms. Edwards' good faith, but it consistently made all credibility determinations in favor of Ms. Edwards. The County offers the Court nothing but recycled arguments that failed before the jury.

The County also claims Ms. Edwards' complaints about criminal activities at the work site was the *real* reason she asked for a modified shift, and thus her disability could not be the basis for her request. Again, the County seeks a credibility determination from this Court that was already made in Ms. Edwards' favor by the jury, based on the same testimony it heard and evaluated. The jury heard Manager Suttle began seeking Ms. Edwards' termination, both in-person and by email with her superior—the very next morning after Ms. Edwards' request for a shift modification based on her medically diagnosed night blindness. Ms. Suttle denied Ms. Edwards notified her about suffering from night blindness or requesting a modified shift because of that condition. The jury heard sufficient evidence to

28

determine Manager Suttle lacked credibility based on her statements that were shown to be false and contradicted by her superiors, as well as Ms. Edwards.

In sum, the jury determined Ms. Edwards made a good-faith request for a shift modification because of her night blindness on October 4, and her additional complaints about criminal activities at the work site on October 5 did not contradict or negate the good faith nature of her October 4 request for an accommodation. Offering the same conjecture and innuendo it offered at trial, the County erroneously asks the Court to discard the jury's credibility determinations it made in Ms. Edwards' favor. The Court should affirm the denial of the County's Motions under Fed. R. Civ. P. 50 and the unanimous jury verdict for Ms. Edwards in all regards.

## STANDARD OF REVIEW

Although the Court reviews the denial of a Fed. R. Civ. P. 50 renewed motion for judgment as a matter of law de novo, it nevertheless must "apply the same deferential standard as the district court." *Mosby-Meachem v. Memphis Light, Gas & Water Division,* 883 F.3d 595, 602 (6th Cir. 2018) (quoting *Arnold v. Wilder*, 657 F.3d 353, 363 (6th Cir. 2011)).

If the plaintiff prevails at trial, courts may enter judgment as a matter of law against the plaintiff only if "a reasonable jury would not have a legally sufficient evidentiary basis to find" in his or her favor. *Mosby-Meachem*, 883 F.3d at 602

29

(quoting Fed. R. Civ. P. 50). In making such a determination, the courts must view the evidence in the light most favorable to the nonmovant, granting all reasonable inferences in their favor. *Mosby-Meachem*, 883 F.3d at 602.Further, the Court should "not weigh the evidence, evaluate the credibility of the witnesses, or substitute [its] judgment for that of the jury." *Mosby-Meachem*, 883 F.3d at 602 (quoting *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1152 (6th Cir. 1995)). "[T]he verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *Mosby-Meachem*, 883 F.3d at 602 (quoting *J.C.Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991)). "A motion for judgment as a matter of law should be granted only if reasonable minds could not come to a conclusion other than one favoring the movant." *Mosby-Meachem*, 883 F.3d at 602 (internal quotes omitted).

For the County to succeed on its renewed motion pursuant to Rule 50, "it must overcome the substantial deference owed a jury verdict." *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 683 (6th Cir. 2024) (internal quotes omitted) quoting *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (citation omitted)).

## LAW AND ARGUMENT

**I.     There was sufficient evidence for a reasonable juror to find that Ms. Edwards' night blindness was an actual and "regarded as" disability under the ADA**

The purpose of the ADA and the subsequent ADAAA is to prevent discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, or privileges of employment." 42 U.S.C. § 12112(a).

The ADA defines "disability" as:

(1) "a physical or mental impairment that substantially limits one or more major life activities of such individual,"

(2) "a record of such an impairment," or

(3) "being *regarded as* having such an impairment."

42 U.S.C. § 12102(1)(A)-(C).

"[T]he definition of disability under the ADA shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A); *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018). This broad remedial reading of a disability is required because the "primary concern of the ADA is 'whether covered entities complied with their obligations and whether discrimination has occurred,' not whether an

individual's impairment is a disability." *Hostettler,* 895 F.3d at 853 (quoting 29 C.F.R. § 1630.2(j)(1)(iii)).

### A.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards' night blindness was a "regarded as" disability under the ADA, as amended

The County makes no argument at all whether or not Ms. Edwards was covered under the third, "regarded as" prong of the ADA's definition of disability. Instead, the County states without any cite to the record that "regarded as" was not a part of this case.[3] That is incorrect. It was pled in the *Amended Complaint* (R. 22, PageID 101, ¶130), was not dismissed by the district court at summary judgment (R. 54, PageID 957), and was included *without any objection from the County* in the Jury Instructions. (R. 75, PageID 1058-59).

In the instant case, the jury determined Ms. Edwards suffered from night blindness, and this condition was a disability under the ADA. (*See Verdict Form*, R. 74, Claim 2(7), PageID 1046). The jury was instructed, without objection by the County, on all three prongs of the ADA definition of disability. (*Jury Instructions*, R. 75, PageID 1058-59). The County failed to address "regarded as" in its Rule 50 motion. On appeal, it makes no argument about the "regarded as" prong nor does it

---

[3] Shelby County's Appellant Brief, R. 21 at p. 20.

allege any lack of evidence to support such a finding. As a result, the County has waived this issue on appeal. *Preferred Rx., Inc. v. American Prescription Plan, Inc.*, 46 F.3d 535, 547–48 (6th Cir. 1995) (failure to object to jury instructions under Rule 51 waives objection on appeal); *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 790 (6th Cir. 2020), *citing Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400–01 (2006) (regarding waiver by failure to include in a Rule 50 motion); and *Bard v. Brown Cnty., Ohio*, 970 F.3d 738, 751 (6th Cir. 2020) ("an appellant abandons all issues not raised and argued in its initial brief on appeal"). On this ground alone, the Court should affirm the trial court's judgment below.

There is good reason for the County's avoidance of discussing "regarded as." Namely, Ms. Edwards clearly satisfies this prong of the definition. The ADA prohibits discriminatory discharge of a qualified individual with a disability. 42 U.S.C. § 12112(a). Under the ADA Amendments Act of 2008—"[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C.

33

§ 12102(3)(A), *quoted in Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019).[4]

The County only disputes whether Ms. Edwards' night-blindness substantially limited a major life activity, but both "substantial limitation" and "major life activity" are irrelevant to a "regarded as" claim. In its brief, the County does *not* dispute Ms. Edwards' night blindness was an *impairment*. Nor could it. The threshold condition of a "regarded as" claim is merely showing a "physical or mental impairment," as defined in federal regulations. *Babb*, *supra*, 942 F.3d at 319. Under those regulations, a "'physical impairment' is otherwise "defined broadly," to include "any physiological disorder or condition ... affecting one or more body systems." *Id.*, *quoting* 29 C.F.R. § 1630.2(h)(1). This Court has specifically recognized that vision problems fit comfortably within that definition. *Babb*, *supra*, 942 F.3d at 321.

---

[4] Although there is a defense to a "regarded as" claim if the defendant shows by objective evidence that the impairment is, or would be, both "transitory and minor," 42 U.S.C. § 12102(3)(B); *Babb*, *supra*, 942 F.3d at 319, the County does not mention this in its Appellate Brief, and thus waives it. And although "regarded as" would not be enough for a failure-to-accommodate claim, 42 U.S.C. § 12201(h), Ms. Edwards' claim was that she was subjected to disparate treatment because of her night blindness. (*Amended Complaint*, R. 22, Para 127; *Joint Pretrial Order*, R. 63. PageID 1005; *Verdict Form*, R. 74, PageID 1046).

The County does not cite a single case holding to support, nor does it even suggest night blindness is not at least an *impairment*. On the contrary, it cites three cases in which the courts referred to the night blindness as an "impairment" or a "vision impairment," sometimes repeatedly. *See Capobianco v. City of New York*, 422 F.3d 47 (2d Cir. 2005); *Livingston v. Fred Meyer Stores, Inc.*, 388 F. App'x 738 (9th Cir. 2010); *Harris v. MatureCare of Standifer Place, LLC*, No. 1:14-cv-64, 2015 WL 4662441 (E.D. Tenn. Aug. 5, 2015). *See also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 501 (3d Cir. 2010) (the plaintiff testified that her monocular vision limited only her ability to drive at night, and the court began its analysis by stating that "[t]here can be no doubt that Colwell's blindness in one eye is a physical impairment"). Moreover, in each of the four cases cited above, the courts found sufficient evidence that the visual impairment was not just an impairment, but a *substantially limiting* one. The County cites these cases, but it makes no attempt to distinguish any of them on the grounds of "impairment."

Of course, the plaintiff in a "regarded as" claim also has to show that the employer took the harmful action because of the impairment. 42 U.S.C. § 12102(3)(A). But the jury so found in this case,[5] and the County does not dispute

---

[5] *See Verdict Form*, R. 74, Claim 2(8), PageID 1046.

that finding on appeal. The County makes no argument that it did not know of Ms. Edwards' impairment, and in fact, cites substantial testimony to the contrary. Because there was sufficient evidence Ms. Edwards' night blindness was a "regarded as" disability, and because the County has waived any claim otherwise, the Court should affirm the district court's judgment on Ms. Edwards' disparate-treatment claim premised on her night blindness.

**B.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards' night blindness was an "actual" disability under the ADA, as amended**

Even absent Ms. Edwards' "regarded as" claim, there was sufficient evidence to support a jury finding that her night blindness was an "actual" disability, especially because the evidence is viewed in the light most favorable to Ms. Edwards and granting all reasonable inferences in her favor.

*i.    Standards for determining an "actual" disability*

An "actual" disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). By the plain language of the statute (as amended), the ADA's definition of disability "shall be construed in favor of broad coverage of individuals … to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A); *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018).

36

"[T]he primary concern of the ADA is 'whether covered entities have complied with their obligations and whether discrimination has occurred,' not whether an individual's impairment is a disability." *Hostettler*, 895 F.3d at 853, quoting 29 C.F.R. § 1630.2(j)(1)(iii). Substantially similar language is contained in the ADAAA. *See* Pub. L. 110-325, § 2(b)(5), 122 Stat. 3554 (Sept. 25, 2008) ("it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis"). The County's position in this case is the opposite of the statutory commands. It does not even attempt to challenge the jury's finding that Ms. Edwards' night blindness was the but-for cause of her termination.[6] Instead, the County's sole focus is whether Ms. Edwards' night blindness was an actual disability.

Ms. Edwards' medically diagnosed night blindness is a physical impairment, as explained more fully above. This satisfies the first element of an "actual" disability. Regarding the second element, "major life activities" is not a "demanding standard." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018), *citing*

---

[6] *See Verdict Form*, R. 74, Claim 2(8), PageID 1046.

29 C.F.R. § 1630.2(i)(2). The ADA expressly defines "major life activities" to include, among other things, seeing, reading, or concentrating. 42 U.S.C. § 12102(2)(A). Major life activities also include the operation of a major bodily function, 42 U.S.C. § 12102(2)(B), which can include functions of the "special sense organs," 29 C.F.R. § 1630.2(i)(1)(ii), like the eyes. Of course, the list provides helpful examples and is by no means exhaustive. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 781 (6th Cir.1998) (citing *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 2205 (1998). 42 U.S.C. § 12102(4)(C) confirms that, '[a]n impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." Further, without objection, the Jury Instructions defined "major life activities" to include operation of special sense organs, seeing, reading, concentrating, and thinking. (R. 75, PageID 1057-58).[7] The County thus waived any argument that these major life activities were not implicated in this case.

The final element requires evidence of a substantial limitation. "Under the 2008 amendments to the ADA, Congress made clear that the definitions of both a "disabled person" and "substantially limits" are to be construed broadly in favor of

---

[7] Ms. Edwards also listed these affected major life activities of seeing and reading in the *Joint Pretrial Order*. (R. 63, PageID 1005; *Amended Joint Pretrial Order*, R. 70, PageID 1030) (the *Joint Pretrial Order* was later amended in other respects).

expansive coverage." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019) "To determine whether a disability substantially limits major life activities, ADA regulations direct a comparison of the person claiming the disability to 'most people in the general population. This is not a demanding standard, and in general, a plaintiff does not need to submit scientific, medical, or statistical proof to establish a substantial limitation. Additionally, an impairment need not prevent, or significantly or severely restrict a major life activity to be substantially limiting." (*Id.*) (citations, and internal quotes omitted). Importantly, the ADA clarifies that "[a]n impairment that is episodic … is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

### ii.    There was sufficient evidence that Ms. Edwards' night blindness was an actual disability

Ms. Edwards' unrebutted testimony was that when driving, her night blindness prevented her from seeing surrounding traffic in her mirrors, and prevented her from reading street signs or exits, or even seeing barricades. (R. 98 PageID 1399-1400). She also testified her blindness substantially limited her ability to concentrate because of the anxiety her blindness caused. (*Id.* at PageID 1400). She testified that after exposure to bright lights, whether from driving, being a car passenger, or at home after driving—she was unable to see the TV, read her mail, and even read a menu. (*Id.* at 1383, 1402). Further, she testified her night blindness

39

was medically diagnosed, began several years prior, was progressively worsening, and affecting the normal function of her eyes. (*Id.* at 1380-82).

The County argues Ms. Edwards' difficulty seeing after being exposed to bright lights was for "a matter of minutes," suggesting it was no different from the experience of most people.[8] There are two problems with this argument, one factual and one legal. Factually, Ms. Edwards' full testimony described something far from the experience of most people; jurors bring their own common sense and life experience into the jury box; they are the "experts" on making such comparisons. Legally, the fact that periods of blindness "were episodic makes no difference under the ADA. So long as the impairment 'would substantially limit a major life activity when active,' that is enough." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018), *quoting* 42 U.S.C. § 12102(4)(D)). The County does not (and cannot) argue periods during which a person cannot see or read are not substantially limiting. Just as in *Hostettler*, "[t]hat is enough for her to be considered an individual with a disability under the ADA." (*Id.* at 854).[9]

---

[8] Shelby County's Appellate Brief at 11, and 26 n. 8, ECF No. 21. Ms. Edwards did not explicitly state how long her inability to read or watch TV lasted, but confirmed "it takes time" to recover her vision. (R. 98, PageID 1383, 1402).

[9] Even before the ADAAA compelled this analysis of episodic conditions, this Court had recognized that conditions that are "intermittent and temporary" are part of the underlying impairment if they are "a characteristic manifestation" of it. *Roush v. Weastec, Inc.*, 96

The County principally argues Ms. Edwards could not be substantially limited if her blindness only occurred while driving. That is contrary to Ms. Edwards' actual testimony, as described above.[10] It is also contrary to the case law. Prior to the ADAAA, the definition of disability under the ADA was interpreted "strictly to create a demanding standard." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). Now, the definition must be interpreted as broadly as the terms allow. 42 U.S.C. § 12102(4)(A). Those standards could hardly be more different. And yet, even before the ADAAA, three Circuits held night blindness that affected nighttime driving was sufficient evidence of an ADA disability.

In *Capobianco v. City of New York*, 422 F.3d 47, 58 (2d Cir. 2005), the court relied in part on evidence that the plaintiff's night blindness "prevents him from driving at night or in dim light, except in the most familiar and well-lit surroundings." The court went on to say that a "jury could surely find that the average person in the general population can drive at night." (*Id*.). (internal quotes omitted).

---

F.3d 840, 844 (6th Cir. 1996) (plaintiff's pain from frequent bladder infections was sufficient to show that her bladder condition was a disability under the ADA).

[10] The *Pretrial Order* listed Ms. Edwards' major life activities substantially affected by night blindness to include, driving at night, seeing, reading, and concentration, respectively. (R. 63, PageID 1004-05; *Amended Joint Pretrial Order*, R. 70, PageID 1029-30).

Additionally, the County argues Ms. Edwards cannot be substantially limited seeing while driving at night because she has done it before. But here, Ms. Edwards' testimony is consistent with the plaintiff in *Capobianco*. Capobianco testified he was able to drive when following another sanitation truck. (*Id*. at 51). Ms. Edwards was able to drive when following the taillights of a police escort and accompanied by a co-worker, and then only on several occasions. (R. 98, PageID 1376). Mr. Capobianco could only drive at night in the "most familiar" surroundings. (*Id*. at 58). Ms. Edwards tries not to drive at all at night, but has done so when *she had to*, and then, only using back roads within a few miles of her home, either to drive to the home of her mother, suffering from Alzheimer's disease, or to grocery stores (and the like) "in the area." (R. 98, PageID at 1401, 1463-64). Moreover, Mr. Capobianco did not testify to any problems with bright lights, which for Ms. Edwards resulted in the inability to read, see signs and barriers, etc.

Similarly, in *Livingston v. Fred Meyer Stores, Inc*., 388 F. App'x 738, 740 (9th Cir. 2010), the employer removed a schedule accommodation that at least minimized the amount of night-time driving the plaintiff had to do. The court found sufficient evidence of a disability in part because the plaintiff could not safely drive at night. But again, Ms. Livingston did not have the problems (with reading, etc.) Ms. Edwards was confronted with after being exposed to bright lights.

42

Further, in *Colwell v. Rite Aid Corp*., 602 F.3d 495 (3d Cir. 2010), the plaintiff testified that her monocular vision limited only her ability to drive at night. (*Id*. at 501). Similar to Ms. Edwards, Ms. Colwell testified that oncoming headlights were a problem, making it hard for her to see well enough to judge distances, and thus making nighttime driving unsafe. Although Ms. Colwell did not testify to any other limitations (in contrast to the facts in the instant case), the court found sufficient evidence of a substantial limitation in seeing. (*Id*. at 502).

Given the outcome in cases decided pre-ADAAA, it will come as no surprise that courts have found an inability to drive safely at night can support a finding of a a disability under the amended ADA. In *Equal Emp. Opportunity Comm'n v. Charter Commc'ns, LLC*, 75 F.4th 729 (7th Cir. 2023), the plaintiff had "mild cataracts," and "[i]n low-light conditions, traffic lights glare, and road objects blurred. An optometrist recommended that even if he wore glasses, [the affected employee] ought to avoid driving at night." (*Id*. at 732). The court found the "testimony about his inability to drive safely at night is evidence of how his vision impairment affects major life activities, such as … seeing…." (*Id*. at 734). The court held this was sufficient evidence of an ADA disability, denying summary judgment. (*Id*.).

43

Likewise, in *Harris v. MatureCare of Standifer Place, LLC*, No. 1:14-cv-64, 2015 WL 4662441, at *3 (E.D. Tenn. Aug. 5, 2015), the court found evidence that the plaintiff's "night blindness prevented her from driving at night" was sufficient to create a jury issue and survive summary judgment. The *Harris* court also rejected the defense argument that the plaintiff could not have a disability if she drove at night on occasion, because (as in the instant case), the plaintiff only admitted to driving short distances at night. (*Id.* at *3, n. 2).

The County misplaces its emphasis on Ms. Edwards' very limited driving at night as a means to undermine her claim. Ms. Edwards's testimony, however, is consistent with precedent. The County's argument also fails because under the ADAAA, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). The statutory language is consistent. *See* Pub. L. 110-325, § 2(a)(8), 122 Stat. 3554 (Sept. 25, 2008) ("defining the term 'substantially limits' as 'significantly restricted' [as] inconsistent with congressional intent, by expressing too high a standard"); § 2(b)(4) (the purpose of the ADAAA is "to reject []  standards … that to be substantially limited in performing a major life activity under the ADA an individual must have an impairment that prevents or severely restricts the individual from doing activities")

44

(internal quotes omitted). In sum, the few examples of Ms. Edwards' very limited nighttime driving in this case do not negate that she has night blindness, nor do they negate she is substantially limited in the major life activities of seeing, reading, concentrating, and functioning of her eyes.

The County also tries to argue driving is not itself a major life activity. But this is a "straw man" argument Ms. Edwards does not urge, and which this Court need not decide. The County mischaracterizes Ms. Edwards' arguments and ignores her supporting testimony that her night blindness affected her ability to read, see, and concentrate, including the ability to see and read after driving or exposure to other bright lights. As discussed above, other circuits have acknowledged this same distinction. *See Colwell*, 602 F.3d at 502 ("It may be that driving and driving at night are not major life activities, but that is not the question presented here, which is whether Colwell's difficulty in driving at night, and her description of why that exercise is dangerous for her, are relevant to the extent to which her ability to see is restricted."). *See also Livingstone*, *supra*, 388 F. App'x at 740 and n.1 (9th Cir. 2010) ("Livingston has raised a genuine issue of material fact that she has a disability under the ADA because she is substantially limited in the major life activity of 'seeing.' … We need not reach Livingston's alternative arguments that her vision impairment substantially limits her major life activities of … driving…"); *Capobianco*, *supra*,

422 F.3d at 58 ("a jury could find that Capobianco's impairment substantially limited his ability to see").

In sum, Ms. Edwards introduced sufficient evidence for a reasonable juror to conclude her night blindness substantially limited several major life activities and supported her claim of disparate treatment. When denying the County's Motion under Fed. R. Civ. P. 50, the district court correctly rejected the County's attempt to narrow Ms. Edwards' actual testimony. Based on the analysis in *Harris v. MatureCare of Standifer Place, LLC*, the court correctly determined a jury should decide whether Ms. Edwards' night blindness qualified as a disability because it affected her ability to see, as established by her stated inability to safely see while driving at night. (R. 99, PageID 1698-1701).

### C.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards' night blindness is a disability despite her acknowledgment of driving on several occasions

The County attempts to diminish Ms. Edwards' credibility by arguing she cannot actually suffer from night blindness because she drives at night. The County's argument misrepresents Ms. Edwards' testimony and is counter to the broad coverage established by the 2008 ADA amendments, specifically, the definition of "substantially limits." First, it was undisputed in the record that Ms. Edwards was medically diagnosed with night blindness. Second, context always matters. Ms.

Edwards confirmed she had driven at night when "she had to" and then, only within a limited area of a few miles of her home. Further, she took back roads to avoid the glare of lights. Her purpose on one of these occasions was to attend to her mother, who was suffering from Alzheimer's disease. She also referenced occasions to purchase food and medicine.

These limited examples, occurring during an unspecified time period, are simply not sufficient to support the County's argument that Ms. Edwards did not suffer with night blindness. Indeed, what the County exclaims is the "biggest elephant in the room" is more of a last-ditch attempt to draw a white rabbit out of its hat. The trick fails however, because the impairment need not prevent, or significantly or severely restrict a major life activity to be substantially limiting. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). A few examples of driving at night within the context explained do not negate Ms. Edwards' night blindness, or that it substantially limits her ability to drive, let alone her ability to see, read, and concentrate. In sum, the district court properly allowed this matter to be determined by the jury, which unanimously found Ms. Edwards suffered from night blindness and it was a disability—regardless of de minimus examples of driving at night, within the context explained by Ms. Edwards.

**II.      There was sufficient evidence for a reasonable juror to find that Ms. Edwards requested a reasonable accommodation in good faith due to her night blindness**

In support of this thinnest of arguments, the County mischaracterizes the record to insinuate *as a matter of law* that Ms. Edwards' request for a reasonable accommodation, a shift modification, was not protected activity because her request lacked good faith. Here, the County's argument is that the Court should override the witness credibility assessments that a jury already decided unanimously in Ms. Edwards' favor, including the component of her good faith. (*Jury Instructions*, R. 75, PageID 1064, *Retaliation Elements*, No. 1) ("To establish a claim retaliation, Ms. Edwards must prove that: [s]he complained about, or objected to, what she believed in good faith was disability discrimination or that she requested a reasonable accommodation under the ADA"). In support of its assertion, the County argues (a) Ms. Edwards' request for a shift modification was actually based on her fear of crime and not her night blindness, and (b) she was aware she did not suffer with night blindness because she actually drives at night.

The County's argument rests entirely on attacking the credibility of Ms. Edwards. The County makes no attempt to argue Ms. Edwards' retaliation claim fails on any other basis, including the causal connection between her request for a modified shift, made contemporaneously with the notice to Ms. Suttle about her

48

night blindness and inability to see at night, and the retaliatory termination Ms. Suttle sought the next morning, both in-person and by email, and then finalized in less than a week. Ms. Edwards will therefore focus on the contentions of the County against her good faith—none of which made any headway with the jury.

As an initial matter, "[a] plaintiff may prevail on a disability-retaliation claim even if the underlying claim of disability fails." *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007) (collecting authorities) (internal quotations omitted). Instead, a plaintiff may proceed based upon a "showing of a good-faith request for reasonable accommodations." *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 777 n. 8 (6th Cir. 2011); *see also Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003) (an individual without a disability "may still pursue a retaliation claim under the ADA … as long as she had a good faith belief that the requested accommodation was appropriate");[11] *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir. 2001) ("However, in order to prosecute an ADA retaliation claim, a plaintiff need not show that she suffers from an actual disability. Instead, a reasonable, good faith belief that the statute has been violated suffices.").

---

[11] This Court cited the *Heisler* case with approval in *Bryson*, 498 F.3d at 577.

Here, on October 4, 2021, after learning of a new shift requiring her to drive home from the work site late at night, Ms. Edwards' immediate response was to point out, "I can't see driving at night. I have nyctalopia. I have night blindness. I cannot work that shift." (R. 98, PageID 1374). She also agreed to obtain a doctor's note to verify her condition but was terminated before that was possible. Ms. Edwards stated she had suffered from night blindness for several years, had been treated by at least two ophthalmologists, was medically diagnosed with night blindness, and confirmed the effects of her night blindness, both historically, and when forced to drive at night on October 5, 2021.

Further, while she acknowledged limited instances of driving at night, Ms. Edwards explained the circumstances of taking back roads to reach her mother suffering with Alzheimer's disease, and to buy food and medicine—when she "had to." When Ms. Suttle quarreled about her ability to drive at night, Ms. Edwards pointed out she had driven at night on occasions between January and March 2021, only with assistance.

Could a reasonable jury believe Ms. Edwards had a good faith belief that her night blindness made night-time driving a safety issue, and that she needed a reasonable accommodation? The answer is yes. The three judges in *Capobianco* found that avoiding night driving for a sanitation worker with night blindness was a

50

"seemingly reasonable accommodation." *Capobianco*, *supra*, 422 F.3d at 61. As did the court in *Equal Emp. Opportunity Comm'n v. Charter Commc'ns, LLC*, 75 F.4th at 742 (modified work schedule might be a reasonable accommodation to make driving safer for an employee who had trouble seeing when driving at night). As did the three judges in *Livingston*, *supra*, 388 F. App'x at 741 (a "modified schedule that permits her to work an earlier shift" was a reasonable accommodation for night blindness). As did the three judges in *Colwell*, *supra*, 602 F.3d at 506 (for an individual who could not safely drive at night, "we hold that the ADA contemplates that employers may need to make reasonable shift changes in order to accommodate a disabled employee's disability-related difficulties"); *see also Carini v. Jacobs Eng'g Grp., Inc.*, No. 3:22-cv-787, 2024 WL 4226911, at *9 (D. Conn. Sept. 18, 2024) (shift change may be a reasonable accommodation for a  person with narcolepsy who could not drive at night, denying summary judgment). The reasonableness of requesting accommodation for night blindness is further supported by the federal funded Job Accommodation Network, which has a paper explaining the condition—including its impact on driving at night, and the fact that some individuals may also have a slower adjustment to a change in light conditions—and listing several potential accommodations.[12]

---

[12] Available online at: https://askjan.org/limitations/Night-Blindness.cfm?csSearch=7118844_1

Certainly, a layperson could reasonably agree, as could a reasonable jury. Accordingly, Ms. Edwards offered sufficient evidence of her good faith for the court to allow the jury to make its fact-specific credibility determination.

Even though the standard of review requires that all inferences be drawn in favor of the verdict, the County improperly seeks to infer that the real reason Ms. Edwards wanted to avoid night driving was because of crime. The County also argued this point to the jury, which flatly rejected it. On October 4, Ms. Edwards asked that her shift be changed because of her night blindness. The following day Ms. Edwards e-mailed her complaint about criminal activities and the lack of safety at the worksite as an *additional* basis for modifying her shift. The two reasons are not mutually exclusive, and indeed, Ms. Edwards' October 5 complaint also referenced her previous conversation with Manager Suttle about her night blindness. Manager Suttle began seeking Ms. Edwards' termination on the morning of October 5, *before* Ms. Edwards' supplemental e-mail regarding criminal activities. Overall, the district court properly allowed the retaliation claim to be decided by the jury, which unanimously found the County liable for unlawful retaliation based on Ms. Edwards' good-faith request for a reasonable accommodation.

**III.    There was sufficient evidence for a reasonable juror to find that Ms. Edwards' asthma was an "actual" disability under the ADA**

Ms. Edwards prevailed on her claim that the County failed to accommodate her asthma. Specifically, the jury unanimously found that:

1) Ms. Edwards suffered from asthma, and her asthma was a disability under the ADA;

2) Ms. Edwards had made a request for a reasonable accommodation due to her asthma;

3) the requested accommodation would not have posed an undue hardship; and,

4) the County did not provide her a reasonable accommodation for her asthma.

The County does not dispute Ms. Edwards had asthma; does not dispute that she requested a reasonable accommodation; does not argue that her requested accommodation (one day of leave to recuperate from an asthma attack), would have posed an undue hardship; and does not dispute that it failed to accommodate her. The only argument that the County makes as to this claim is that Ms. Edwards' asthma was not an "actual" disability under the ADA.

As stated above, the amended ADA requires that disability be interpreted broadly "to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A). But the statute has two other mandatory rules of construction applicable to this claim. First, "[a]n impairment that is episodic or in remission is a

53

disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D); *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018). Second, the ADA requires that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as … medication…." 42 U.S.C. § 12102(4)(E)(i). Further, breathing, sleeping, walking, and the operation of the respiratory system are all major life activities, 42 U.S.C. § 12102(4)(E), as the jury was instructed without objection.

Ultimately, at trial Ms. Edwards presented evidence that her asthma condition—when active and unmitigated—substantially limited her ability to breathe, sleep, and walk from room to room in her home. She was originally diagnosed with asthma in 2018 following a three-day visit to the emergency room because she had been unable to breathe. (R. 98, PageID 1357). Her pulmonologist told her she was "a train wreck waiting to happen." (*Id.).* In December 2020, as part of her pre-employment physical exam, Ms. Edwards informed the County that she suffered from asthma. (*Id.* at 1354–56). During this period, she took Breo and Montelukast, which are medications that help her breathe. (*Id.*)

Ms. Edwards carries her rescue inhaler at all times. (*Id.* at PageID 1466). While the Breo helps her breathe, it will not prevent an asthma attack triggered by

certain perfumes or marijuana smoke. (*Id*. at 1466–67). When she is "around ... smoke [or certain other substances - perfumes], [she is] going to have an asthma attack, and then [she is] going to have to use the rescue inhaler." (*Id*. at 1466).[13] She can use her rescue inhaler twice but will need to go to the emergency room if it does not work. (*Id*.). As noted above, substantial limitations must be assessed without regard to the ameliorative effects of mitigating measures such as medication. 42 U.S.C. § 12102(4)(E)(i). In the instant case, there was clear evidence of what happens when Ms. Edwards is unable to use her medication mitigating measures.

For over a week prior to September 15, 2021, Ms. Edwards had been looking for her Breo medication to help her breathe, but nobody in the city had it. (R. 98, PageID 1355–13). During this active flare-up of her asthma, Ms. Edwards had been unable to sleep almost all night because of her coughing and wheezing caused by asthma. (*Id.* at 1356–57). Indeed, her wheezing was so pronounced that she heard it as a loud whistle. (*Id.).* Her breathing was so limited she had difficulty simply moving from her bedroom to her bathroom. (*Id.* at 1357–58. *See also* R. 97, PageID 1323). She used her rescue inhaler and tried an alternative medication to Breo that

---

[13] The County argues that the evidence only showed that Ms. Edwards' asthma "could" be triggered by certain stimuli, Shelby County's Appellate Brief at p. 18, incorrectly implying that her asthma had not *actually* caused her any limitations. That is inconsistent with the actual evidence, of course, and the jury was free to reject that attempted inference. It obviously did so.

had been prescribed by her pulmonologist, but it did not work. (R. 98, PageID 1358). Her asthma was also made worse because it was raining that night. (*Id.* at 1360).

As a result of her difficulty breathing, sleeping, and walking within her own home because of her asthma, Ms. Edwards called her manager, Ms. Suttle, to request a day of leave—leaving a voicemail at 4:30 a.m. and again at 7:30 a.m. when Ms. Suttle called her. (*Id.* at 1359–60). Ms. Edwards told Ms. Suttle that she was coughing and had not slept because of her asthma, and did not have her Breo medication. (*Id.)*. Ms. Edwards was scheduled to work at 8:30 a.m. (*Id.)*. After her request for one day of leave was rejected (*Id.* at PageID 1360), Ms. Edwards went to work despite a lack of sleep, feeling feeble, and coughing and wheezing. (*Id.* at 1367–68).

Also, to determine if an impairment substantially limits major life activities, courts are to "compare the person claiming a disability to 'most people in the general population.'" *Morrissey v. Laurel Health Care Co*., 946 F.3d 292, 299 (6th Cir. 2019), *quoting Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018), which in turn quoted 29 C.F.R. § 1630.2(j)(1)(ii). A jury could easily view the (unmitigated and active) manifestations Ms. Edwards described as drastically different from the experience of most people, and substantially limiting her breathing, sleeping, and walking, when making that comparison.

On appeal, the County erroneously relies on the non-precedential, and divided, opinion in *Andrews v. Tri Star Sports & Ent. Grp., Inc.*, No. 23-5700, 2024 WL 3888127 (6th Cir. Aug. 21, 2024). The facts in *Andrews* are plainly distinguishable from Ms. Edwards' circumstances. Andrews was never hospitalized overnight as a result of her asthma and never went to the hospital at all solely because of her asthma. (*Id*. at *4) (she went once when she had anxiety caused by her carbon monoxide detector going off, and once when she had the flu, neither time overnight). Furthermore, she testified that her asthma "can limit her breathing—but only in these transient, isolated, or 'extra strenuous' circumstances." (*Id.* at *5). Further, Andrews' employer demonstrated she actually physically performed these activities well beyond the abilities of the average person, including, e.g., attending gymnastics twice a week, and participating in CrossFit workouts two or three times a week, each lasting 100–200 minutes. *(Id.).*[14]

Ms. Edwards' asthma starkly contrasts to the circumstances faced by *Andrews*. Here, Ms. Edwards was hospitalized for three days in 2018, after which

---

[14] It is worth noting that although the Court referenced the provision in its summary of the ADA, the plaintiff/appellant in *Andrews* did not cite, describe, or claim the benefit of the ADA's mitigating-measures rule of construction in 42 U.S.C. § 12102(4)(E). *See* Brief of the Appellant Christie Andrews, 2023 WL 7491671 (Nov. 6, 2023). This is in marked contrast to the argument and evidence in the instant case.

time she needed to carry both an asthma inhaler, and Breo, a maintenance medication designed to help her breathe. Ms. Edwards testified without rebuttal that without access to her medications, she suffered substantial limitations in several major life activities. Ms. Edwards further offered evidence that on September 15, 2021, when she was without medication, her asthma became "active"—i.e., she had an asthma attack. This attack made it very difficult for her to breathe, almost impossible to sleep, and even walk from room to room in her home.[15] As a result of the above, there was legally sufficient evidence in support of the jury finding that Ms. Edwards' asthma was an "actual" disability under the ADA.

## **CONCLUSION**

There was sufficient evidence for a jury to determine Ms. Edwards was disabled because she suffered from night blindness which substantially limited major life activities. The County waived any argument whether she was "regarded as" disabled. There was also sufficient evidence for a jury to determine Ms. Edwards requested a reasonable accommodation in good faith based on her night blindness, and, as a result, was terminated due to disparate treatment and retaliation. Lastly, there was sufficient evidence for a jury to determine Ms. Edwards was disabled

---

[15] The *Pretrial Order* listed Ms. Edwards' claimed major life activities substantially affected by asthma to include, breathing, walking, climbing stairs, sleeping, and concentrating, respectively. (R. 63, PageID 1004-05).

because she suffered from asthma that substantially limited major life activities, and the County failed to reasonably accommodate her.

Respectfully, the district court's denial of the County's Motion pursuant to Fed. R. Civ. P. 50, and the judgment against it by a unanimous jury, should be affirmed.

**Dated:**   February 18, 2025

*Respectfully Submitted,*

/s/Steven G. Wilson
STEVEN G. WILSON
Tenn. Bar #028460
The Steve Wilson Firm
5100 Poplar Ave., Ste 2700
Memphis, TN 38137
Tel.: (901) 337-1300
steve@stevewilsonfirm.com

*/s/*Matthew C. Gulotta
MATTHEW C. GULOTTA
Tenn. Bar #028194
The Gulotta Firm, PLLC
202 Adams Ave.
Memphis, TN 38103
Tel.: (901) 213-6648
matt@gulottalaw.net

*Counsel for Rebecca Edwards*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the typeface and volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) as follows: The typeface is fourteen-point Times New Roman font, and the total number of words is 12,131, which is less than the 13,000-word limit.

*/s/*Matthew C. Gulotta

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I caused the foregoing brief (with Addendum), to be served through the Court's CM/ECF system.  All counsel of record are registered CM/ECF users.

*/s/*Matthew C. Gulotta

**ADDENDUM**
**(DESIGNATION OF DOCUMENTS)**

| Description of Document | Record# | PageID# |
|---|---|---|
| Complaint | 1 | 1-25 |
| Amended Complaint | 22 | 79-103 |
| Defendant's Motion for Summary Judgment | 38 | 162-163 |
| Defendant's Memorandum in Support of its Motion for Summary Judgment | 38-2 | 168-186 |
| Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment | 54 | 913-968 |
| Pretrial Order | 63 | 1003-1017 |
| Amended Pretrial Order | 70 | 1028-1042 |
| Minute Entry | 72 | Not Applicable |
| Verdict Form | 74 | 1044-1048 |
| Jury Instructions | 75 | 1049-1069 |
| Judgment | 78 | 1075 |
| Notice of Appeal | 85 | 1108-1109 |
| Trial Transcript - Day 1 | 97 | 1144-1338 |
| Trial Transcript - Day 2 | 98 | 1339-1544 |
| Trial Transcript - Day 3 | 99 | 1545-1766 |
| Trial Transcript - Day 4 | 100 | 1767-1828 |